**Dannie MARTIN and The Chronicle Publishing Company, Plaintiffs,**

v.

**R.H. RISON, Warden for the United States Penitentiary at Lompoc, California; Tom Curd, Assistant Warden; Paul Hofer, Executive Assistant to the Warden; Jerry Williford, Director, Western Region Federal Bureau of Prisons; and the Federal Bureau of Prisons, Defendants.**

**No. C–88–2570–CAL.**

United States District Court, N.D. California.

June 26, 1990.

Neil L. Shapiro, Cooper, White & Cooper, San Francisco, Cal., for San Francisco Chronicle.

Jeffrey A. Leon, Jeffer, Mangels & Butler, San Francisco, Cal., for plaintiffs.

Mark St. Angelo, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## OPINION

LEGGE, District Judge.

This action was tried to the court, sitting without a jury, and was briefed, argued and submitted for decision. The court has heard and reviewed the testimony of the witnesses, and has reviewed the record, the exhibits admitted into evidence, the deposition transcripts admitted into evidence, the answers to interrogatories, the applicable authorities, and the arguments of counsel. This opinion constitutes the court's findings of fact and conclusions of law, as provided in Rule 52(a) of the Federal Rules of Civil Procedure. The facts stated below are found to be facts by a preponderance of the evidence, and by applying the burdens of proof discussed in paragraph VI.

### I. JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, 2201, and 2241, and 5 U.S.C. § 702, *et seq.* (1982), and the first, fourth, fifth, and sixth amendments to the United States Constitution. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (e) (1982), because one defendant resided in this district at the time the suit was filed and some of the acts that

gave rise to plaintiffs' claims occurred in this district.

Defendants have contested subject matter jurisdiction, on the grounds of the defense of sovereign immunity from plaintiffs' claims for monetary relief. However, because of the conclusions reached below, this court need not discuss that contention. Defendants also asserted that this court lacks subject matter jurisdiction over the claims of plaintiff The Chronicle Publishing Company, because The Chronicle lacks standing to assert those claims. That motion was previously denied by this court. Defendants also objected to venue, but defendants' objections were denied.[1]

## II. SUMMARY OF FACTS

Plaintiff Dannie Martin is a convicted felon, who at the time of these events was incarcerated in the U.S. Penitentiary in Lompoc, California. The nature of Martin's conviction and his sentence need not be discussed here. Martin was assigned to Lompoc Penitentiary in part because his prison security level is consistent with that of Lompoc. Lompoc Penitentiary and its adjacent prison camp house approximately 2200 prisoners. Plaintiff The Chronicle Publishing Company is the publisher of "The San Francisco Chronicle," a newspaper of general circulation.

While in prison, Martin developed skills as a writer. For approximately two years before the events in question here, Martin wrote articles and submitted them to The Chronicle. His articles were generally

about prison life. Some were critical of prison authorities and some were not. The Bureau of Prisons took no action against Martin for any of his articles until the *Gulag* article discussed below.

The Chronicle published approximately 18 of Martin's articles in a features section of Sunday editions of The Chronicle. The Chronicle treated Martin as a features writer, printed his byline on his articles,[2] and identified him as a prisoner in Lompoc. When it received articles from Martin, The Chronicle did some editing, had some conversations with Martin about changes, wrote the headlines, did the art work, and selected the pull-quotes to be set within the articles. Martin's articles were well received by the public.

The Chronicle paid Martin for each of the articles. The Chronicle's payments went to Martin's attorney, because of Bureau of Prison regulations that limit an inmate's access to cash, and because of one of the regulations at issue here.

The events causing this suit were precipitated by an article which Martin wrote and The Chronicle published, entitled *The Gulag Mentality*, in June 1988. When that article was published by The Chronicle and the newspaper was circulated within Lompoc prison, prison officials became concerned about possible violence. They placed Martin in administrative detention for a few days, while they conducted an investigation. Martin was then released from administrative detention. A few days later, the Bureau of Prisons transferred Martin to another federal prison, where he

---

**1.** The court now rules on the following evidentiary and procedural issues which arose during the trial: (1) Plaintiffs' motion to file a further amendment to the complaint is denied. The claims they seek to assert (that as a matter of regulatory interpretation plaintiff Martin did not violate the Bureau of Prisons regulations regarding compensation, bylines, being a reporter and conducting a business) are legally incorrect for the reasons discussed in this opinion. (2) Defendants' motion for dismissal as a matter of law, under Rule 41(b) of the Federal Rules of Civil Procedure, is denied. The issues raised in that motion are instead ruled upon in this opinion under the standard of a preponderance of the evidence and under the applicable law. (3) The declarations of N. Brooks and B. Hairsch tendered by plaintiffs, and defendants' offer of

proof regarding the testimony of certain witnesses, filed on January 5, 1990, are admitted into evidence and have been considered by this court in making the findings of fact and conclusions of law. (4) All deposition designations by both plaintiffs and defendants are admitted into evidence. (5) Exhibits 1 through 31 are not admitted into evidence. Insofar as the exhibits are offered by plaintiffs to show that other inmates wrote articles and received a byline or compensation, this court is assuming those facts for purposes of this opinion. (6) Exhibits 65 through 69 are not admitted into evidence, because of lack of relevance and hearsay.

**2.** One article was published under a pseudonym, at Martin's request.

is still incarcerated. Martin has continued to write and publish in The Chronicle under a preliminary injunction issued by this court.

The facts surrounding these events are discussed in more detail as appropriate below.

## III. BUREAU OF PRISONS REGULATIONS

Defendants charged that Martin violated two regulations of the Bureau of Prisons, which regulations are the focal point of plaintiffs' suit.

One is 28 C.F.R. § 540.14(d)(4) (1988):
An inmate ... may not direct a business while confined.

The other is 28 C.F.R. § 540.20(b) (1988):
The inmate may not receive compensation or anything of value for correspondence with the news media. The inmate may not act as a reporter or publish under a byline.

Those sections are a part of voluminous regulations of the Bureau of Prisons for the operation of federal prisons.[3] They include many subjects not of concern in this litigation.

There are extensive regulations, some restrictive but some very permissive, regarding contacts between inmates and the outside world. Part 540, of which the two challenged regulations are a portion, expressly deals with "contact with persons in the community." Those regulations include specific sections concerning inmate correspondence with the news media, and contacts between prisoners and the news media. The obvious objectives of the regulations as a whole are to permit inmates to communicate with the outside world, and to permit the news media to have access to inmates, to the extent that those communications do not interfere with the security of a prison. Most of those regulations need not be discussed in detail. Suffice it to say that the regulations attempt to balance the interests of the inmates, persons outside

the prisons, the news media, and the security interests of the prison. The regulations also provide that they shall nevertheless be subject to the authority of the prison warden to act in preserving the security of the prison. Section 501.1 states: "When there is an institutional emergency which the Warden considers a threat to human life or safety, the Warden may suspend the operation of the rules contained in this chapter to the extent he deems necessary to handle the emergency." While this apparently refers to a suspension of all rules for all prisoners, and hence is not directly applicable to this case, it reflects the discretion vested in prison wardens when there is a danger to prison security.

## IV. PLAINTIFFS' CLAIMS

Plaintiffs challenge the two regulations on federal constitutional grounds. Essentially, they contend that both regulations are unconstitutional on their face.[4] Plaintiffs also challenge the constitutionality of the two regulations as they were applied to Martin and as they have been applied throughout the prison system. Plaintiffs make related allegations that defendants' actions against Martin were in retaliation for his criticism of prison authorities, and that Martin's due process rights were violated.

## V. THE ROLE OF THIS COURT

Before discussing the application of the constitution to the regulations and to the acts of defendants, it is important for this court to note just what its role is and is not. The court's function is limited to determining whether defendants' regulations and acts met or violated constitutional requirements.

This court's function is not to determine whether Martin, or any other prisoner, "should" be able to write for publication. Having read Martin's articles and having heard the evidence, this court of course has its own opinions on that subject. Martin's

---

**3.** All section references to the regulations are to 28 C.F.R.

**4.** Their facial challenge to § 540.14(d)(4) is as that regulation is applied to the business of writing.

articles are entertaining and educational. Some of them appear to have actually produced worthwhile results. Martin's writing style is light, concise, and easily readable. Many legal writers, scholars, attorneys—and yes, judges—could well imitate his style.

Writing by prisoners also appears to be worthwhile for rehabilitation, particularly if a prisoner such as Martin is able to use it as a base for a future career outside the prison. Writing is a healthy use of time. The writing of published articles could provide a good role model for other prisoners. And such articles, even if critical of the prison system, may provide a nonviolent means to defuse tensions within a prison. The public appears to be interested in the subject of life in prison; and light and air, literally or figuratively, are generally healthy to any institution.

But this court's role is not that of a senior editor or a censor. The task of running the federal prisons has been delegated by Congress to the Bureau of Prisons, not to the courts. The Bureau has attempted to strike a balance between freedom of expression and prison security. This court's function is limited to determining whether that balance is consistent with the constitution.

## VI. BURDEN OF PROOF

Who has the burden of proof in applying the requirements of the constitution to the regulations and to the acts of the parties?

 Both the burden of going forward with the evidence and the ultimate burden of proof usually lie with plaintiffs. However, plaintiffs here assert that the burden of proof is on defendants to demonstrate the constitutionality of the regulations. Such a shifting of the burden is proper where the regulations at issue restrict the speech of the general public. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986). Plaintiffs also rely on *Pepperling v. Crist*, 678 F.2d 787 (9th Cir.1982), *subsequent appeal dismissed*, 739 F.2d 443 (9th Cir.1984) a decision of this circuit in-

volving prisoners' challenges to state prison guidelines.

However, this court believes that plaintiffs' arguments and *Pepperling* have been superseded by recent decisions of the United States Supreme Court. That Court appears to place the burdens upon the prisoners who challenge the constitutionality of prison regulations. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987); *Washington v. Harper*, — U.S. —, 110 S.Ct. 1028, 1039–40, 108 L.Ed.2d 178 (1990); *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Bell v. Wolfish*, 441 U.S. 520, 551, 99 S.Ct. 1861, 1880, 60 L.Ed.2d 447 (1979).

The most direct recent discussion of the burdens of proof by the Supreme Court is *Thornburgh v. Abbott*, — U.S. —, 109 S.Ct. 1874, 1882, n. 12, 104 L.Ed.2d 459 (1989). The Court said that it was not expressly passing on the evidentiary burdens or on the shifting of those burdens. But the Court extended deference to the procedures used by the district court, which applied a shifting of the procedural burdens with the ultimate burden of proof being on the prisoners.

This court believes that the initial burden is upon plaintiffs to establish a *prima facie* case that the regulations or the acts of defendants violated plaintiffs' claimed constitutional rights. The burden of going forward with the evidence then shifts to defendants to articulate a reasonable relationship between the regulations, their acts, and some legitimate penological objective. The burden of going forward with the evidence, and the ultimate burden of proof, is then on plaintiffs to refute that showing, or to otherwise invalidate the regulations and acts. Plaintiffs may attempt to do so on grounds such as pretext, other alternatives, irrational conduct, or arbitrary conduct. For example, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the

policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62. Further, the regulations must operate in a neutral fashion without regard to the content of the expression. *Id.* at 90, 107 S.Ct. at 2262.

Recent Supreme Court cases might be read as defining the burden of proof to be evidence which is "substantial" or "conclusive". However, this court need not define or apply those higher measures of proof here, since it concludes that plaintiffs have not carried their burden of proof by the measure of a preponderance of the evidence.

## VII. CONSTITUTIONAL STANDARDS

■ The question of whether the regulations meet constitutional requirements is of course governed by the Supreme Court's decisions defining the rights, primarily the first amendment rights, of prisoners. It is clear that prisoners do have first amendment rights. But those rights must be balanced with their status as prisoners and with legitimate penological objectives. As stated by the Supreme Court in *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974):

> [A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*See also Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984).

In recent first amendment cases, the Court has extended considerable deference and discretion to the decisions of prison administrators. The Court said in *Turner v. Safley*,

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

482 U.S. at 84–85, 107 S.Ct. at 2259–60. *See also O'Lone*, 482 U.S. at 349–350, 107 S.Ct. at 2404–05; *Block v. Rutherford*, 468 U.S. 576, 588, 104 S.Ct. 3227, 3233–34, 82 L.Ed.2d 438 (1984); *Harper*, 110 S.Ct. at 1038; *Abbott*, 109 S.Ct. at 1879; *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878; and *Jones*, 433 U.S. at 128, 129, 97 S.Ct. at 2539, 2540. The rationale for this judicial policy is that the problems of prison administration are ill suited to resolution by court decree, and are more rationally within the expertise and powers of the executive branches of government.

■ Coupled with this judicial deference to prison officials, the Supreme Court has also defined a rational relationship test. That is, prison regulations and the acts of prison officials meet constitutional standards if they are rationally related to a legitimate penological objective. *Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2261–62; *Abbott*, 109 S.Ct. at 1882.

Plaintiffs contend that a stricter constitutional test is required by *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Plaintiffs argue that the test defined in *Martinez* has survived the more recent Supreme Court cases cited above, because *Martinez* dealt expressly with communications going out of a prison and involved consideration of the public's interests. However, *Martinez* was recently discussed by the Supreme Court in *Abbott*, 109 S.Ct. at 1879, n. 9, and in *Turner*, 482 U.S. at 84–89, and *Martinez's* holding has been restricted and in part disapproved by the Court. And in the present case we are not dealing exclusively with outgoing communications, as was *Martinez*. Here, the outgoing communications were newspaper articles which were then revised, published, and redistributed back into the prison. Indeed, the consequences of the writ-

ings were not created by sending them out, but by their publication and distribution back into the prison. Because of both that factual distinction and the Supreme Court's recent pronouncements in *Turner, Abbott,* and *Harper,* this court concludes that the *Martinez* standard is not the one applicable here.

Rather, the standard to be applied is that announced by the Supreme Court in *Turner v. Safley.* The test is whether, giving due deference to the discretion of prison officials, their regulations and acts bear a rational relationship to a legitimate penological objective. As stated in *Turner v. Safley,*

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators ..., and not the courts, are to make the difficult judgments concerning institutional operations."

482 U.S. at 89, 107 S.Ct. at 2261 (*quoting Jones v. North Carolina Prisoners' Union,* 433 U.S. at 128, 97 S.Ct. at 2539). This standard was recently restated in *Washington v. Harper:*

> [T]he proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is "reasonably related to legitimate penological interests." This is true even when the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review.

110 S.Ct. at 1037 (quoting *Turner,* 482 U.S. at 89, 107 S.Ct. at 2262).

## VIII. DETERMINATION OF REASONABLENESS

*Turner* defined four factors which are relevant to a determination of the reasonableness of prison regulations and practices.

1) Whether there is a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest;

2) If alternative means of exercising the constitutional right remain open to prison inmates;

3) The impact an accommodation of the asserted right would have on the guards and other inmates, and on the allocation of prison resources; and

4) The absence of ready alternatives. 482 U.S. at 89–91, 107 S.Ct. at 2261–63.

This court heard extensive testimony concerning penological objectives, the regulations, and the acts of defendants. That testimony included both percipient and expert testimony. There was little difference in the testimony of the percipient witnesses; that is, there was not much dispute as to the facts of what occurred.

There were significant differences in the conclusions reached by the penological experts. They agreed generally on the basic penological objectives, but they differed on whether these regulations and their enforcement served those objectives. The differences of opinion were grounded in part on whether the objectives are viewed from the perspective of the prisoners, or from the perspective of the prison authorities. All of the experts did agree that one of the—if not *the*—principle penological objective is to maintain security within a prison. The term "prison security" can be and was used in several ways; *e.g.,* to mean the absence of violence, the prevention of escape, the protection of prison staff, the protection of prisoners, and the general running of a harmonious institution. And merely invoking the word "security" can become a knee-jerk response to any changing situation. However, the experts did agree that there are genuine security concerns within a prison, and that security is a major penological objective. The U.S. Supreme Court agrees: "[C]entral to all other correctional goals is the institutional consideration of internal security...." *Pell,* 417 U.S. at 823, 94 S.Ct. at 2804. The *Turner v. Safley* tests must be applied in that context.

1) Is there a valid, rational connection between the regulations and legitimate, neutral governmental interests?

■ Plaintiffs argue that the regulations impose a restriction on the *content* of prisoners' writings. However, this is not a so-called "prior restraint" case. That is, no attempt is made to edit, restrain or prevent written material from going out of the prison or from being published. The regulations do not control the content of what is said. Plaintiffs therefore argue that inmates by virtue of being prisoners can report only on prison affairs, and that a flat prohibition on newspaper reporting therefore prevents anything being written or published about prison events or conditions. But this argument ignores the fact that the regulations do allow prisoners to write via "special mail" to the news media. Section 540.20(a) (1988). Outgoing special mail may be sealed by the inmate and is not subject to inspection by the prison authorities. Section 540.18(c) (1988). Incoming special mail is opened only in the presence of the inmate, and only to allow prison staff to inspect for physical contraband. 28 Section 540.18(a) (1988). The correspondence cannot be read or copied by prison officials. *Id.* Moreover, neither the special mail regulations nor the regulations at issue here make any reference to the subject matter of the writings. The regulations are facially neutral with respect to content.

What are the legitimate governmental interests served by the regulations? Defendants' primary objective is prison security. The legitimacy of that governmental interest is supported by the testimony of the experts and by the above decisions of the Supreme Court. There are other valid penological interests, such as rehabilitation, which would weigh in favor of looser control by the prison authorities. But as long as prison security is a valid interest, the order of priority of the penological interests is for the Bureau of Prisons and not this court to decide.

The regulations are therefore content-neutral and for a stated and legitimate governmental objective. Do the regulations rationally and reasonably promote that objective? This court believes that they do for the following reasons disclosed by the evidence:

Articles about matters within a prison can create a danger of violence, or at least threats of violence. Indeed, the testimony demonstrated that such dangers and threats occurred in Lompoc prison after the publication of the *Gulag* article.

Lompoc prison houses many prisoners requiring a high level of security. While most prisoners, including Martin, were a level four or below, the prison population included some at levels five and six; six is the maximum security level. There was testimony that Lompoc was a volatile population, with some gangs and with frequent disciplinary problems. There had been unrest within the prison some months earlier, when the warden temporarily limited the use of the exercise yard, and when the prison replaced chairs which some prisoners believed were theirs. Some causes of unrest were mentioned in Martin's articles prior to *Gulag*. One of the witnesses testified that tensions in the prison were high before *Gulag*, and that there had been a planned boycott of meals and some fires. After the publication of *Gulag*, which again mentioned those incidents, inmates again complained about the earlier restrictions on the hours of the exercise yard and about the replacing of the chairs, although both incidents had occurred months before.

The *Gulag* article appeared in the June 19, 1988 edition of The Chronicle and was received at the prison the same day. The article contained express statements about murders, assaults, and possible violence or rioting. The staff then noticed more clustering of groups of prisoners. The associate warden and a visitor were intimidated by a prisoner about Martin several days later, and the associate warden received a threat. One of the staff members was told by his prison crew that there was going to be trouble. The staff member wrote a memorandum to his superiors with that information. There is some question whether these events and the prisoners' statements were motivated by the article or

by Martin's being placed in administrative segregation. But in either event, there were indications of a security problem.

Reporting for a newspaper can also focus attention on individual prisoners in a manner which might lead to violence or unrest. Individual prisoners have their own separate interests within a prison. Some desire anonymity, and some form factions or gangs for various purposes. Most prisoners fear, or at least dislike, change in their routine or privileges. Most inmates fear a riot or violence, since it can result in either injury to them, or at least greater restrictions by the prison administration. Most prisoners do not wish to be identified or "pushed" by reporters. On the other hand, some prisoners are against whatever occurs and look for reasons for discord. There are therefore dangers, to the prisoner-reporter as well as to the prison population generally, because of the possibility of violence, retaliation or prevention of disclosure.

Newspaper articles from within a prison can have an adverse impact on the prison staff. The staff may fear that everything they say will be reported by prisoner-reporters in the public media. They have duties of private counseling with prisoners which could be undermined by public disclosure of their confidential communications. The staff could also lose control over some of the prison population, who might act more in response to public recognition than to the requirements of the staff. Writers could become alternatives to the staff. That is, a writer, or other persons attempting to manipulate a writer, may attempt to produce the results that one group of inmates wants through public pressure. There was testimony that the prison staff was upset as a result of the article. One staff member did not want to even talk to Martin because of concern that his name or his statements could end up in a newspaper.

Permitting a prisoner to write regularly for a newspaper, and to be paid by the paper, also creates loyalties to the paper rather than to the prison authorities. While obliged to follow the orders of the

prison staff, the writer-prisoner might instead be encouraged to do things which create "news" or serve the interests of a good story, which could push prisoners and staff into positions or factions that might be dangerous.

The regulations also serve a legitimate desire not to give undue prominence to a particular prisoner within the prison population. This is known as the "big wheel" problem. One of the basic principles of prison administration is the egalitarian treatment of all prisoners. Having a "big wheel" within the prison population undermines that principle. The press often concentrates on a small number of inmates, who as a result become virtual public figures within the prison society and gain a disproportionate degree of notoriety and influence among their fellow inmates. The "big wheel" problem has been recognized by the Supreme Court.

[A]s a result those inmates who are conspicuously publicized because of their repeated contacts with the press tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison.

*Saxbe v. Washington Post Co.*, 417 U.S. 843, 848–49, 94 S.Ct. 2811, 2814–15, 41 L.Ed.2d 514 (1973); *see also Pell*, 417 U.S. at 831–32, 94 S.Ct. at 2808–09. On the basis of this concern, the Supreme Court upheld outright prohibition of face-to-face interviews with individual prisoners in *Pell* and *Saxbe*. A prisoner writing with a byline, acting as a reporter, getting compensation, or running a business similarly poses problems of disproportionate notoriety and influence. Martin specifically testified that he wanted bylines. He valued the name recognition, and felt that it would be helpful to him to sell his other written work. He also stated that he wanted the public to take action about certain matters within a prison. The regulation against conducting a business within the prison also reduces the dangers posed by wealthy inmates, who might use their wealth (maintained either outside or inside the prison) for purposes of power and control.

The public's expectations about prisons and prisoners' activities are also relevant. The public reasonably expects that confinement in a prison will temporarily end the prisoner's outside activities. And legislation such as the "Son of Sam" statutes indicate that neither the public nor legislatures want prisoners to benefit financially from their criminal activities or from their detention in prison.

Even plaintiffs' experts testified that some of the stated security concerns were valid and were rationally promoted by the regulations at issue here. One expert agreed that having a full-time reporter in a prison would be contrary to prison security. He also agreed that if an article does inflame conditions within a prison, it is contrary to valid security interests and the prison authorities can stop it. He stated further that a genuine security problem can override the prisoners' rights to send information in and out of the prison. Two experts testified that the prohibitions against newspaper reporting and conducting a business furthered a legitimate penological concern, not having prisoners doing things that are not supervised by the prison. They also testified that some writings can and should be prevented, such as those inducing riot, escape, violence, or even libelous attacks on the warden or the prison administration. They also testified that the prohibition against engaging in a business promotes two legitimate penological objectives, the staff's right to control the prison population and the public's concept of what activities confinement in a prison should limit.

■ Have the writings of prisoners actually resulted in the dangers contemplated by the regulations? The experts differed. There was evidence that at least some of those dangers did result from the *Gulag* article, as discussed above. Are the potential dangers offset by the benefits of more public awareness of prisons? These are questions which are not within the power of this court to decide. They are for the Bureau of Prisons to decide. As long as the regulations rationally and reasonably promote the objective of prison security,

defendants are not obligated to show an actual danger to prison order and security. As stated by the Supreme Court:

> The informed discretion of prison officials that there is a potential danger may be sufficient even though this showing might be "unimpressive if ... submitted as justification for governmental restriction of personal communication among members of the general public."

*Jones*, 433 U.S. at 133 n. 9, 97 S.Ct. at 2541 n. 9 (quoting *Pell*, 417 U.S. at 825, 94 S.Ct. at 2805).

**2) Do alternative means of exercising constitutional rights remain open to prison inmates?**

If other avenues remain available for the exercise of a right, "courts should be particularly conscious of the 'measure of judicial deference owed to correctional officials ... in gauging the validity of the regulation.'" *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262 (quoting *Pell*, 417 U.S. at 827, 94 S.Ct. at 2805).

These regulations are part of a larger body of regulations that recognize prisoners' first amendment rights and provide for contact between prisoners and the media. The regulations here at issue are limited exceptions to the broad grants to prisoners of means for exercising their rights of expression. Prisoners retain the privilege of correspondence to and from news media representatives; Section 540.20(a) (1988). The media has access to interviews with prisoners; § 540.63. And prisoners have broad rights to communicate with other members of the general public; *see* §§ 540.10–540.25 (correspondence); §§ 540.40–540.52 (visitation).

**3) What would be the impact on the guards, on other inmates, and on the allocation of prison resources if the claimed rights were accommodated?**

If the alleged right to publish newspaper articles can be exercised only at the cost of significantly less liberty and safety for others within the prison, staff and prisoners alike, courts should defer to the informed discretion of correctional officials. *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262; *Ab-*

*bott,* 109 S.Ct. at 1884. The concern to be evaluated is the "ripple effect" that the exercise of a privilege can cause within the prison. *Id.*

Martin wrote in the *Gulag* article that some prisoners believed that a riot loomed, and some witnesses testified that this produced effects within the prison. There was agitation within the inmate population, security adjustments had to be made, and additional staff time had to be spent.

Where exercise of a right requires this kind of a tradeoff, we think that the choice made by corrections officials—which is, after all, a judgment "peculiarly within [their] province and professional expertise," *Pell v. Procunier,* 417 U.S., at 827 [94 S.Ct., at 2806]—should not be lightly set aside by the courts. *Turner,* 482 U.S. at 92–93, 107 S.Ct. at 2263–64.

4) Were there ready alternatives?

The absence of ready alternatives is evidence of the reasonableness of regulations. *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. Conversely, the presence of obvious and easy alternatives for achieving the penological objectives is evidence that the regulations are not reasonable but are an "exaggerated response" to prison concerns. *Id.* However, prison officials do not have the burden of demonstrating that a regulation is "the least restrictive alternative." *Id. See also, Abbott,* 109 S.Ct. at 1883–1884. Even the existence of less restrictive means for achieving security objectives is not proof that the response is exaggerated. *Block v. Rutherford,* 468 U.S. 576, 581, 104 S.Ct. 3227, 3230, 82 L.Ed.2d 438 (1983).

Plaintiffs argue that there are alternatives to the prohibitions imposed by these regulations. Plaintiffs contend for: censoring the newspapers when they reach the prison; controlling the time, place, and manner of the distribution of articles within the prison; or pre-publication notice to prison officials.

The Bureau of Prisons has the right to monitor incoming publications for their impact on prison security. *See* §§ 540.70 and 540.71, *Abbott,* 109 S.Ct. at 1877. However, that alternative would require prison officials to read virtually every publication coming into the prison in order to determine if it contained one article dangerous to security. In *Abbott,* the Supreme Court upheld a regulation which permitted the warden to prevent inmates from receiving entire publications if he determined that they contained any material detrimental to security. *See Abbott,* 109 S.Ct. at 1877, n. 5. The Court rejected the argument that tearing out the offending portions would be an easy alternative. *Id.* at 1884. Similarly in *Turner,* the Supreme Court found that requiring prison officials to monitor inmate correspondence, in lieu of a total ban on inmate-to-inmate correspondence, would impose more than a *de minimis* burden on the prison system. *Turner,* 482 U.S. at 93, 107 S.Ct. at 2264. Requiring individual monitoring of daily newspapers would be an extensive burden, and would create an even greater danger to society—the censorship of the content of daily newspapers. While alternatives to the prohibitions of these regulations might exist, the court finds that the burdens of using those alternatives would be substantial.

This court concludes that the regulations are valid under all four parts of the *Turner* test. They are rationally related to the legitimate penological objective of prison security.

### IX. OVERBREADTH

■ Plaintiffs also attack the regulations on grounds of their being overly broad. The argument is that they are broader than necessary to serve even the legitimate objective of prison security, and that they sweep within their prohibitions other constitutionally protected free speech.

If an overbreadth analysis is used, a regulation is void if it "does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that in ordinary circumstances constitute an exercise" of protected rights of expression. *Thornhill v. Alabama,* 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940).

However, this court does not believe that such an overbreadth analysis is required in a case involving a prisoner's writings. The United States Supreme Court has now considered and discussed the principal rights of prisoners that are protected by the first amendment: the rights of association and union membership, in *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1976); the freedom of written expression, in *Turner v. Safely*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); the right to receive information and publications, in *Thornburgh v. Abbott*, 109 S.Ct. 1874 (1989); and the free exercise of religion, in *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). In each of those cases, prisoners challenged prison regulations and the Supreme Court applied a rational relationship test, without engaging in an analysis of the possible overbreadth of the regulations. Specifically, the most recent opinions in *Turner*, *O'Lone*, and *Abbott* demonstrate that when an attack on regulations is made by a prisoner, the four-part *Turner* test is the analytic framework to be used. A separate analysis of possible overbreadth is not required.

## X. VAGUENESS

■ Plaintiffs also attack the language of the regulations as being unconstitutionally vague. Of particular concern are the meanings of the words "business," "reporter," and "publishing under a byline."

The testimony indicated that some of the terminology used in the writing and publishing of newspapers is not precise in the industry, and that the terminology can and has overlapped. The lack of precision includes the words used to express the type of writings; *e.g.*, items, news, opinion-editorial, letters to the editor, features, first person commentary, and articles. There is also imprecise usage of the words describing the persons who do the writing; *e.g.*, reporter, stringer, correspondent, byline, identification line, and free-lance. All of these terms have some imprecision in definition, some overlaps, and some changes in usage over the years. But such variations

in the use of words do not rise to the level of unconstitutional ambiguity.

It is easy to look at a regulation (or a statute or a contract), to see some word that doesn't expressly fit the particular facts, to then claim that is an "ambiguity," and to then argue that the ambiguity must be unconstitutional. But such a syllogism ignores the fact that constitutional rights are rights and not just exercises in semantics. Not every difficulty in using language should rise to the level of an ambiguity which is unconstitutional. All writing is subject to various meanings of words depending upon their context. A thesaurus is as important a tool in language as a dictionary. And there are few, if any, writers who can use words in any written expression without some ambiguity, or at least some necessity for the application of the words to the facts. The terms here, whether describing the writing or the writer, are not ones of precise definition or consistent usage even in the publishing industry. So the regulations can only be expected to use the words in their common sense meaning and to express their general intent.

The proper analysis is to look for: the basic rights involved, what conduct the regulations intend to permit or prohibit, and whether the words give fair notice to the reader of the conduct prohibited. The refinement of more precise distinctions must be left to semanticists. Here, the right is free speech expression, unless the exercise of that right interferes with the security of the prison. The regulations obviously intend to permit and to prohibit free speech within that spectrum. The regulations certainly give fair notice to prisoners that they should not write for compensation, work for newspapers, publish under bylines, or conduct businesses. Plaintiffs have not shown an ambiguity or vagueness which rises to the level of a deprivation of constitutional rights.

## XI. CONSTITUTIONALITY AS APPLIED

Plaintiffs' attacks on the regulations are not just on the regulations themselves.

Plaintiffs also contend that the regulations are unconstitutional as they were applied to them. This argument is made under the due process and equal protection clauses of the constitution. The line between an attack on regulations for unconstitutionality on their face, versus unconstitutionality as applied, is not always clear. When the standard is, as it is here, that a regulation is to be upheld if it is reasonably related to a legitimate penological objective, the regulation itself and the application of that regulation become interwoven.

■ The question of whether a regulation was constitutionally applied to an individual is judged according to equal protection standards. *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). Plaintiffs make several claims in that regard. (1) They point to other activities in which prisoners are allowed to engage, and from which they make some compensation. (2) They point to other prisoners who have written for compensation. (3) They argue that some prison officials knew that Martin was writing for compensation, but took no action against him until the *Gulag* article. (4) These claims also involve plaintiffs' contention that defendants' stated reason for applying these regulations was simply a pretext for punitive action against Martin and The Chronicle. These contentions will be examined in this and the next sections.

### A.

■ Federal prisoners are allowed to engage in some activities in prison and to make some compensation from those activities. They include: hobby craft, where prisoners can make and sell their art work and handicraft; work for Unicor Industries, a prison-supervised manufacturing company; and other types of writing for publication, including fiction, poetry, books and scripts. However, the similarities between those permitted activities and Martin's prohibited activities do not lead to unconstitutional distinctions.

In order for there to be an unconstitutional denial of due process or equal protection, there must be first some legally recognized right or liberty interest that is protected. *Meachum v. Fano,* 427 U.S. 215, 223–24, 96 S.Ct. 2532, 2537–38, 49 L.Ed.2d 451 (1976). The United States Supreme Court has specifically held that inmate activities and rehabilitation programs are delegated by Congress to the "full discretion" of the Bureau of Prisons, and that they do not create a "legitimate statutory or constitutional entitlement sufficient to invoke due process." *Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976). The Ninth Circuit has agreed; *Hernandez v. Johnston,* 833 F.2d 1316, 1319 (9th Cir.1987); *Rizzo v. Dawson,* 778 F.2d 527, 531 (9th Cir.1985). As stated by another circuit in *Sellers v. Ciccone,* 530 F.2d 199, 201 (8th Cir.1976), "courts will not, as a general rule, audit the exercise of that discretionary power."

A prisoner can make an equal protection claim against prison officials only if the treatment was "invidiously dissimilar to that received by other inmates." *Peck v. Hoff,* 660 F.2d 371, 373 (8th Cir.1981); *Black v. Lane,* 824 F.2d 561, 562 (7th Cir. 1987); *See also Moody v. Daggett, supra.* Several cases have recognized that the prohibitions against prisoners receiving compensation or running a business in prison are constitutional limitations. *Procunier v. Martinez,* 416 U.S. at 414 n. 14, 94 S.Ct. at 1812 n. 14; *Johnson v. Avery,* 393 U.S. 483, 490, 89 S.Ct. 747, 751, 21 L.Ed.2d 718 (1969); *Garland v. Polley,* 594 F.2d 1220 (8th Cir.1979); *Valentine v. Gray,* 410 F.Supp. 1394, 1396 (S.D.Ohio 1975). The reason is that such limitations are part of the restrictions of activities that are generally incident to lawful incarceration; *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). A decision of this circuit is particularly appropriate here; *Stroud v. Swope,* 187 F.2d 850, 851 (9th Cir.1951), *cert. denied,* 342 U.S. 829, 72 S.Ct. 53, 96 L.Ed. 627 (1951). The Ninth Circuit there held that an inmate had no right to secure publication of a book he wrote, or to engage in general correspondence with outsiders to promote that business.

The above authorities support the conclusion that Martin has no *right* to engage in writing for compensation. It is a privilege, not a constitutional right, and one that the Bureau of Prisons may regulate, even on a selective basis if the objective of the regulation is legitimate. The legitimate objective in this case was prison security, and the regulation was applied reasonably. Martin's writing did invoke concerns for prison security at Lompoc.

There is a valid distinction between writing newspaper articles and other types of writing. The immediacy of newspaper information, and its recirculation into the prison, are key differences which raise valid concerns about security. Newspaper articles are therefore distinguishable from other types of prisoner activities which do not pose security problems.

### B.

The same points and authorities answer plaintiffs' argument that other prisoners within the federal prison system have written for compensation.

There was extensive evidence, primarily by way of deposition, that other federal prisoners have written for publication and have successfully marketed their writings. The evidence disclosed perhaps two instances of prisoners who wrote under a byline for a newspaper, although it was questionable whether they had acted as a reporter and had received compensation. It was also uncertain whether the Bureau of Prisons took any disciplinary action against them, but the court will assume that the Bureau did not.

This claim of disparate treatment led the parties into extensive discovery and arguments about each instance of successful prison writing, including numerous justifications asserted by defendants. But this court does not believe that a detailed analysis of that evidence or those arguments is necessary. As stated, engaging in writing activities is not a constitutionally protected *right*, either for purposes of due process or equal protection. Such activities are delegated by Congress to the discretion of the Bureau of Prisons. And the line which defendants have drawn here—*i.e.*, writing which affects prison security—is reasonably related to a legitimate penological objective.

■ As stated by the U.S. Supreme Court, "[t]here is nothing in the constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." *Jones*, 433 U.S. at 136, 97 S.Ct. at 2543. Fully consistent treatment of a large group of prisoners, with varying factual circumstances, is virtually impossible. Even one of plaintiffs' experts testified that not all inmates *can* be given privileges which are fully equal. And variations in treatment do not all rise to the level of constitutional violations.

### C.

■ Numerous employees at Lompoc prison did know that Martin was writing for The Chronicle before the *Gulag* article appeared, and one or two employees of the Bureau's regional office also knew. It is less clear whether they knew the extent or regularity of Martin's writings, and whether they knew that he was being compensated. The warden and other administrative staff at Lompoc prison had no knowledge of Martin's prior writings before *Gulag* was published.

No one took any action concerning Martin's writings before *Gulag*. Indeed, Martin's articles were cited as a factor in his favor during his parole hearings before the United States Parole Commission. Martin argues that because no action was taken before the publication of *Gulag*, enforcing the regulations after *Gulag*, an article critical of prison authorities, was an unconstitutional deprivation of his due process and equal protection rights.

For the reasons stated, this court doubts that the asserted right is a right at all, rather than a privilege which the Bureau of Prisons is free to administer for a legitimate penological objective. But even if a right were involved, the decision whether to enforce every breach of a regulation is a

discretion vested in the Bureau of Prisons. 18 U.S.C. § 4001, § 4081; regulations § 541.10(b)(2), § 541.14, § 541.23(a) and (d); *Sellers v. Ciccone*, 530 F.2d 199, 202 (8th Cir.1976). Not all violations of prison regulations are prosecuted. Rather, there is an exercise of proper discretion by prison staff in deciding what to prosecute.

One Bureau official testified that he first saw an article by Martin in late 1986, and he believed then that it violated the regulations. He was concerned, but after consulting with the Bureau's attorney and with the then warden, he had no reason to believe that the article raised any concern for security and decided not to take any action. He later saw two other articles which were critical of prison authority; but after discussions, he again decided not to do anything because, although critical, they posed no security problems. The Bureau of Prisons did act after *Gulag* because of concerns for security created by that article. *Gulag* contained statements about violence and rioting. And Martin testified that he thought there was a riot coming, that there was a potential for violence, and that the article might influence the public.

The fact that defendants did not respond to Martin's earlier articles, which they believed did not create security concerns, but did act after *Gulag*, which did give rise to security concerns, is not so unreasonable or arbitrary as to rise to the level of a constitutional violation. To succeed on a claim of selective enforcement, plaintiffs' must show that the enforcement of the regulations was "motivated by a discriminatory purpose." *Wayte*, 470 U.S. at 608, 105 S.Ct. at 1531. The court finds that the enforcement at issue here was for the purpose of the security of the prison. The regulations were not applied as a pretext for punitive action against Martin or The Chronicle, but in furtherance of a genuine penological concern for security.

## XII. THE SEGREGATION AND TRANSFER OF MARTIN

■ Martin also challenges the acts of defendants after the *Gulag* article appeared. He was placed in administrative detention for a few days, was then returned to the general prison population, and was then abruptly transferred to another federal prison. Martin attacks those acts on grounds of alleged violations of due process and equal protection.

This court finds from the evidence that defendants acted because of a genuine concern for prison security and for no other reason. The necessity for some action was the result of events and conditions within the prison after *Gulag* was published. Defendants conducted an investigation, engaged in deliberative discussions, and conferred with the general counsel of the Bureau of Prisons. Whether their concerns about security were or were not accurate in retrospect is not the issue here. The point is that defendants acted from a genuine concern about security. That finding is supported by events and conditions in the prison which have already been discussed, and by the following facts.

Many witnesses testified to changes in the mood of the prison population at the time of the publication of *Gulag*, Martin's administrative segregation, and then his release into the general population. The changes in mood were variously, and perhaps inconsistently, described. But the testimony was consistent that there were changes, and that changes are an indicator of potential difficulties within the prison.

It is a practice of prison officials to make themselves available to the inmates at the prisoners' noon meal. This is an opportunity for prisoners to approach the warden and his staff and to express complaints, suggestions, or requests. Ordinarily, numerous inmates approach the warden and his staff each day. However, on June 20, the day after *Gulag* appeared, no inmates approached the warden or the staff. The silent treatment continued on June 21. The associate warden was later approached by two inmates, who told him that the article was not representative of the views of all of the inmates. While that information may have been consoling, it nevertheless raised the question of possible factions of inmates.

When the warden received a copy of the *Gulag* article, he became concerned about its effects on the prison, and called a meeting of his staff. Many of the staff had not seen the article before meeting with the warden. The staff discussed their concerns about possible violence against prison authorities, and also their concerns about possible prisoner retaliation against Martin. The article reported an unnamed inmate as saying that the warden was trying to start a riot and that the inmates might as well give him a riot and get it over with. The staff's concern was not only about a riot, but also that inmates might take some action against Martin for quoting them, to prevent him from identifying them to the staff, or for perhaps for creating a violent situation where none had existed. The chief of prison security was particularly worried about a riot and about the safety of Martin. These concerns were expressed and discussed against a background of riots that had recently occurred at two other federal prisons.

The warden and his staff decided that it was necessary to put Martin into administrative segregation, for his own protection, while an investigation of possible violence, either generally or against Martin personally, could be made. One of the experts testified that such administrative detention was proper. The standard, and indeed the required, operating procedure is that protective action be taken *while* an investigation is conducted.

An investigation was promptly conducted. A few days later, when the investigation indicated that there was probably no personal danger to Martin, he was released from administrative detention and returned to the general prison population. However, the prisoner population appeared to remain polarized even after Martin was released from administrative segregation.

The investigation continued. The warden left to attend a conference of wardens in another state, but conferred with the Lompoc staff by telephone daily. They concluded that tensions at the prison were becoming precarious, and that the inmates were choosing sides over the issue of Martin and

his writing. The investigation included tape-recorded telephone conversations between Martin and The Chronicle editor, in which Martin and the editor discussed that Martin would continue to write about matters at the prison. The recordings disclosed that Martin intended to write an article about the high security unit within the prison and about the inmates there. Because of the nature of that unit, and the special prisoners who are housed there, disclosure of their identities or the reasons for their segregation could result in potential violence. The tape recorded conversations between Martin and The Chronicle indicated that further articles would be written "to keep pressure and heat on" the warden.

As a result of the investigation and the tense conditions at the prison, the warden and his staff concluded that Martin should be transferred. A warden does not have the authority to order the transfer of a prisoner without the approval of the regional director of the Bureau. The warden therefore contacted the regional director, who was also attending the warden's conference. They also sought the opinion of the general counsel of the Bureau of Prisons. The situation was discussed in detail, and the general counsel's opinions were solicited. As a result of the consultations and opinions, the regional director authorized Martin's transfer from Lompoc.

Martin was transferred on June 30. The method of removing Martin from Lompoc and transferring him to another prison was more hasty than the usual procedures for the transfer of a prisoner. However, the haste was justified by genuine concerns for security. The transfer of Martin had the actual result of gradually defusing the tensions within the prison.

Martin alleges a violation of his due process rights because he was transferred to another prison without the use of the normal procedures. While his transfer was done in haste, and without a hearing, no *procedural* due process rights were violated. The Bureau of Prisons was within its authority to determine that the interests of the security of the prison required Martin's

prompt transfer. The transfer was administrative and not punitive in nature; that is, no punishments were otherwise imposed on Martin, such as deprivations of his privileges or a delay of his release date. One of plaintiffs' experts agreed that transfer is an option to avoid problems. He said that a warden should investigate, weigh the information, and consider the negative implications. Another expert testified that a warden can taken action to protect a prisoner or to prevent him from becoming the cause of a disturbance, and such action can properly include administrative segregation or transfer. The warden, the prison staff, and the Bureau of Prisons properly did so in this case.

█ Plaintiffs argue that there is no real difference between administrative action and disciplinary action. That is, both resulted in Martin's being in stricter detention and then being transferred, and both should invoke due process protection. But the evidence and the law demonstrate that there is a genuine difference between administrative action and disciplinary action, even though some of the results to the prisoner may be the same. The differences are real and are not just words. The regulations themselves draw distinctions, both in substance and in procedure, between segregation for the purpose of discipline versus segregation for the purpose of administrative detention and protection. *See* Part 541, and particularly §§ 541.22 and 541.23. Administrative detention or transfer can be used for protection, for investigation, or for reclassification, and they involve no penalty or punishment such as the ultimate loss of privileges or a delay in the date of the prisoner's release from prison. Disciplinary action, on the other hand, is a sanction which can result in a loss of privileges, and in a report to the Parole Commission which could affect the prisoner's ultimate release date. Disciplinary action can therefore only be taken after a hearing.

█ Martin also argues that his *substantive* due process rights were violated, because under a table of prohibited acts and their punishments, set forth in Table 3 of § 541.13, the penalty for conducting a business is limited to the prisoner being restricted to his quarters. However, as stated, the actions against Martin were not disciplinary. And Martin does not have a constitutionally protected liberty interest in the punishment stated in the table which cannot be offset by valid concerns for prison security. Section 541.13, Table 3, Code 399 authorizes segregation and transfer for conduct which interferes with security. *See also,* § 501.1 quoted above. The case authorities suggest that a prisoner can be transferred, even for engaging in permitted first amendment activity, if the Bureau of Prisons has legitimate security concerns. *Baraldini v. Thornburgh,* 884 F.2d 615, 620–21 (D.C.Cir.1989). The method of analysis of a prisoner's claimed rights is again the *Turner v. Safely* standards. *See also Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982); *Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

This court finds and concludes that Martin was transferred, under the administrative procedures of the Bureau of Prisons, for valid reasons of prison security, and was not transferred as a pretext or for purposes of retaliation.

### XIII. THE CHRONICLE

█ This opinion has used the term "plaintiffs" without much differentiation between Martin and The Chronicle.[5] The court must now address the question of whether the fact that a newspaper is a party requires a stricter constitutional analysis.

The Chronicle argues that it has different constitutional rights, which require different analysis, because of the nature of its functions. It decides what to publish. It decides whether an item will be printed as

---

**5.** The claim of plaintiff Nancy Hoffman, a reader of Martin's articles in The Chronicle, was previously dismissed.

news, an article, an editorial opinion, a special feature, or the like. It decides whether to give the writer a byline. It writes the headlines, does the art work, and selects the pull-quotes. These are different functions from those of the writer, which The Chronicle calls "editorial discretion." These matters are indeed within its discretion. But the use of the label "editorial discretion" does not necessarily invoke some different level of constitutional rights. The court must still examine whether the regulations really impact a newspaper's discretion.

The regulations do not inhibit the content of what is printed by The Chronicle. They do not authorize the Bureau of Prisons to tell The Chronicle what can or cannot be printed, and the Bureau has not attempted to exercise such a power. The Chronicle is free to publish whatever it wants. And as already noted, there are extensive regulations which assure newspapers access to prisoners and to prison information. The regulations are addressed to the prisoners, and not to the news media. And restraints on an author do not automatically constitute interference with the editorial discretion of publication; see *Pell v. Procunier, infra.*

The Chronicle argues for a stricter standard of judicial review, and hence a higher level of constitutional rights, by reference to *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1973). Specifically, the Supreme Court said in that case,

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how government regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Id.* at 258, 94 S.Ct. at 2840.

While that quotation is unimpeachable first amendment law, it is not the issue in the present case. The legislation at issue in *Miami Herald* specifically dealt with what the newspaper was required to print. The regulations at issue here do not. The Chronicle is free to print or to reject whatever it wants of Martin's writings. The restraints which the regulations place on Martin as a prisoner do not prohibit The Chronicle from publishing anything that he sends to them.

The U.S. Supreme Court has upheld restrictions on the access of the press to prisoners; *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1973). And in *Saxbe v. Washington Post,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1973), the Court held that prohibiting interviews between newspapers and prisoners did not abridge freedom of the press.

The Chronicle argues that any restrictions on Martin, its source of information, interfere with its right to gather the news. The Supreme Court did recognize in *Pell* that the function of news gathering may implicate first amendment rights. However, the court said that

> The Constitution does not, however, require government to accord the press special access to information not shared by the public generally. It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public.... It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court.

417 U.S. at 834–35, 94 S.Ct. at 2810–11 (footnote and citations omitted).

Under its present regulations, the Bureau of Prisons gives the press greater access to information than the general public. Prisoners can send writings to the news media as "special mail," which prison authorities may not read. The regulations also afford the news media the opportunity for personal interviews with prisoners. The regulations do not unduly limit The

Chronicle in its sources of information. The regulations do not prevent The Chronicle from reporting on prisons or prisoners.

The restrictions which the regulations place on Martin do not deprive The Chronicle of any higher rights of constitutional dimension. The rights of The Chronicle in this case are still governed by the *Turner v. Safely* standards. This was made clear by the U.S. Supreme Court in *Abbott:*

> We do not think it is sufficient to focus ... on the identity of the individuals whose rights allegedly have been infringed. Although the court took special note in [*Martinez*] of the fact that the rights of non-prisoners were at issue, and stated a rule in [*Turner*] for circumstances in which 'a prison regulation impinges on inmates constitutional rights,' any attempt to forge separate standards for cases implicating the rights of outsiders is out of step with the intervening decisions in [*Pell, Jones,* and *Bell*]. These three cases, on which the court expressly relied in *Turner* when it announced the reasonableness standard for 'inmates' constitutional rights' cases, all involve regulations that affected rights of prisoners *and* outsiders.

109 S.Ct. at 1879, n. 9.

## XIV. CONCLUSIONS

For the reasons stated, this court finds and concludes that the penological interest of prison security was invoked by Martin writing and The Chronicle publishing the *Gulag* article. The fact that there was a genuine concern for security was established by a preponderance of the evidence. The regulations at issue bear a reasonable relationship to that bona fide penological interest. The application of the regulations, and the segregation and transfer of Martin, were not arbitrary or capricious, and were not for purposes of retaliation.

Prison security was not a pretext for punishing the content of Martin's writings.

Specifically with respect to the causes of actions alleged in the first amended complaint, the court finds and concludes that: plaintiffs' first amendment rights of freedom of speech and freedom of the press were not violated; Martin's due process rights under the fifth and sixth amendment were not violated; plaintiffs' rights of equal protection under the fifth and fourteenth amendments were not violated; defendants' conduct was not arbitrary or capricious in violation of the Administrative Procedure Act, 5 U.S.C. § 702 (1982); and defendants' actions were objectively reasonable, and were not malicious or oppressive.[6]

In conclusion, the court hopes that the Bureau of Prisons will not misinterpret this result. It is not *carte blanche* for the Bureau to restrain opinions which it does not like. In a civilized society governed by the rule of law, voices of dissent cannot and should not be suppressed. History has been punctuated by writers who have emerged from prison cells to become spokesmen for humanity. As the United States Supreme Court has held, and as the Bureau of Prisons itself recognizes, prisoners do have first amendment rights. When those rights conflict with a genuine concern for prison security, as in this case, restraint can be imposed. But the word "security" cannot be just a label invoked to shield all actions from scrutiny. While the decisions of the Supreme Court and this court accede to the Bureau's discretion when properly exercised, that is not a totally "hands-off" principle. As the length of this case—and indeed this opinion—demonstrates, federal courts will scrutinize the validity of prisoners' claims.

IT IS THEREFORE ORDERED that the preliminary injunction is dissolved and that

---

**6.** The first amended complaint (paragraph twenty-nine), also alleges a cause of action for the search and seizure of Martin's personal possessions, as unreasonable under the fourth amendment. Little if any testimony was introduced at trial pertaining to that issue. The court believes that the genesis of that allegation was a taking of Martin's writings and writing materials by defendants when he was transferred, which this court later ordered to be returned to him. Martin has subsequently continued to write. The court concludes from the evidence, or lack of evidence, that Martin has not established any violation of his fourth amendment rights which entitle him to further redress by this court on that cause of action.

judgment be entered for defendants and against plaintiffs.