Adrian LOMAX, and Edge Cooperative, a Wisconsin cooperative, Plaintiffs-Appellants, †

v.

Patrick FIEDLER, Terri Landwehr, Oscar Shade, Ronald Molnar, Christopher Ellerd, Linda Milliren, Pat Poe #1, Pat Poe #2, Pat Poe #3, Dan Buchler, Raymond Chavez, Mario Canziani, Jerry Konitzer, Jeff Smith, Ronald Torsella, Cathy Jess, Gregory Grams and Gordon A. Abrahamson, Defendants-Respondent.

Court of Appeals

*No. 95–2304. Submitted on briefs July 12, 1996.—Decided August 22, 1996.*

(Also reported in 554 N.W.2d 841.)

†Petition to review denied.

196

For the plaintiffs-appellants the cause was submitted on the brief of *Gillam Kerley* of Madison.

For the defendants-respondents the cause was submitted on the brief of *James E. Doyle*, attorney general, with *Stephen J. Nicks*, assistant attorney general.

Before Eich, C.J., Dykman, P.J., and Vergeront, J.

EICH, C.J. This appeal tests, on constitutional grounds, a prison's right to discipline an inmate, Adrian Lomax, for violation of prison rules, based on the content of articles written by him and sent to a newspaper, THE MADISON EDGE, for publication and eventual distribution inside the prison. It involves consideration of the appropriate standards for courts to apply in reviewing prison-imposed restrictions on inmates' First Amendment rights, as well as a determination of the merits of Lomax's claim of a constitutional violation.

200

While the United States Supreme Court, in several recent opinions, has discussed the applicable standard of review in such cases, the precise question presented by Lomax's appeal has yet to be decided in Wisconsin. Our review of those cases satisfies us that the "reasonable relationship" standard of *Turner v. Safley*, 482 U.S. 78 (1987), and *Thornburgh v. Abbott*, 490 U.S. 401 (1989), applies to the prison's actions and, employing that standard, we conclude that they were " 'reasonably related to legitimate penological interests,' " *Thornburgh*, 490 U.S. at 409 (quoting *Turner*, 482 U.S. at 89), and thus pass constitutional muster. We therefore affirm the trial court's judgment dismissing Lomax's action—which he had commenced against several prison officials for their actions in charging him with violating prison rules and finding him guilty.

The facts are not in dispute. Lomax, an inmate at the Waupun Correctional Institution, and later at the Racine Correctional Institution, had for some time been submitting articles on prison affairs and conditions to THE MADISON EDGE, a free, biweekly newspaper published in Madison. Many of his articles were critical of prison authority and conditions of confinement. This case concerns two of those articles.

The first, entitled "Chronicle of a Death Foretold," was written about a Waupun correctional officer, Captain Patricia Garro. In the article, Lomax wrote that Garro was an "outrageously sadistic" guard who continually and illegally abused her authority and violated a variety of state laws and regulations in her relations with inmates. He said she was "emotionally disturbed" and her actions were "wreak[ing] havoc throughout the prison." Citing the work of a sociologist, he described Garro as a "hard-ass," and concluded that her actions constituted "an open invitation for a shiv in the back."

201

He stated that "she will one day be killed by a prisoner," and that he "fully concur[red]" in her demise.

Lomax sent the article to the EDGE, where it was published after minimal editing. Copies of the paper were mailed to some sixty inmate subscribers at Waupun and to prisoners in other Wisconsin correctional institutions. A civilian teacher employed at Waupun also brought several copies of the article into the institution, posting one on her bulletin board and leaving copies on a table in her office.

When a Department of Corrections administrator, Terri Landwehr, saw a copy of the issue containing the "Chronicle" article, she instituted an investigation, which eventually resulted in the issuance of a conduct report to Lomax, charging him with violating various prison rules for his part in the publication and distribution of the article within the prison. After a hearing, the Racine disciplinary committee found Lomax guilty of violating several rules, including the rule on "disrespect," WIS. ADM. CODE § DOC 303.25, which states that an inmate "who overtly shows disrespect"—which is defined to include "derogatory . . . writing" and "name-calling"—is guilty of an offense. Relying on the evidence before it, the committee concluded that the references to Captain Garro in the "Chronicle" article were disrespectful within the meaning of the rule and that the "threatening . . . nature" of the article "show[ed] an intent to harm" and to harass her. The committee imposed discipline of eight days' adjustment segregation and 360 days' program segregation.

A few weeks later, Lomax published another article in the EDGE, this one entitled "Of Mice and Men." The article focused on Christopher Ellerd, the security director at Racine, whom Lomax described as an "extortion[ist]" who has "stir[red] up gang animosity"

202

against individual inmates and "is not above even the most outrageous lie" in his efforts "to justify oppressing . . . prisoner[s]." It accused Ellerd of "shameless abuse of . . . power" in intimidating prisoners and recounted stories of his purported actions—including one in which he allegedly denied medical treatment to an injured prisoner. Calling Ellerd "one of the slimiest correctional officials I've ever known," the article concluded that he "represents the worst in humanity" and "is a thoroughly sadistic, deceitful, unscrupulous wretch." Like the EDGE issue containing the "Chronicle" article, this one was also mailed to inmates at Waupun, Racine and other institutions.

A conduct report was issued to Lomax for this article as well, charging him again with "disrespect" and with "lying about staff" in violation of another DOC rule. As was the case with the conduct report resulting from publication of "Chronicle," the "Mice and Men" report discussed at length the prison staff's investigation of the various factual assertions made in the article and found them to be unsubstantiated. After a hearing, the disciplinary committee found Lomax guilty on both counts, specifically finding that his story of Ellerd's denial of medical treatment for an inmate's injury was "false and thus a lie" and, further, that the comments about Ellerd were both disrespectful and derogatory.

In both decisions, the committee expressly found Lomax knew that copies of the EDGE were sent into the Racine prison. And, in stating its reasons for the penalties imposed in both cases, the committee found the articles both created "a risk of serious disruption at the institution" and "undermine[d] the staff[']s authority to maintain an orderly environment" at the prison.

Lomax appealed both cases to the wardens, who affirmed the committee's decisions.

Lomax and the EDGE[1] then sued Landwehr, Ellerd and several other prison officials, including the wardens and the secretary of the Department of Corrections, under the federal Civil Rights Act, 42 U.S.C. § 1983, claiming the prison's actions violated his rights to freedom of speech and press under the First Amendment. Lomax also contended the disciplinary action taken against him deprived him of liberty without due process of law, claiming that the evidence before the committee was insufficient to support a finding of guilt in both cases.[2]

The defendants moved for summary judgment dismissing the action. As in this court, the first issue before the trial court was the appropriate standard to apply in assessing Lomax's First Amendment claims. After holding hearings and considering voluminous sets of affidavits and other proofs submitted by all the parties, the trial court rejected Lomax's argument that the Racine prison's actions should be judged under the "strict-scrutiny" analysis of *Procunier v. Martinez*, 416 U.S. 396 (1974), *overruled by Thornburgh v. Abbott*, 490 U.S. 401 (1989), a case in which the U.S. Supreme Court subjected a challenged prison rule restricting inmates' personal communications directed solely outside the prison to a high degree of scrutiny. The trial court concluded that because Lomax knew his article would be circulated to inmates, the proper analysis by

---

[1] Because Lomax and the EDGE filed a joint brief, raising a single set of arguments, we will use "Lomax" to refer to both appellants throughout this opinion.

[2] As will be seen in Part IV, *infra*, Lomax has abandoned his due process challenge to the disciplinary actions, continuing his sufficiency-of-the-evidence claim on other grounds.

which to judge his claim was that employed in subsequent Supreme Court cases, notably *Turner* and *Thornburgh*—an analysis that accords greater deference to the decisions of prison administrators in situations where the offensive communications are directed into the prison.

Analyzing Lomax's claims under the *Turner/Thornburgh* standard, the trial court held that the undisputed evidence contained in the parties' submissions on the summary judgment motion established as a matter of law that the prison's action in disciplining Lomax for writing and publishing the articles was reasonably related to legitimate penological interests and thus should not be overturned. Lomax appeals from the judgment dismissing his action.

In considering Lomax's appeal, we do not assume the role of editor, censor or prison administrator. The legislature has delegated the task of running the state's prisons to the Department of Corrections, not to the courts. Our only function is to determine whether the challenged actions strike a reasonable, constitutionally permissible, balance between the rights of prisoners and legitimate concerns of prison administration and security.

There is no question that imprisonment does not strip inmates of all constitutional rights—including free-speech rights protected by the First Amendment. As the *Turner* Court observed: "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. It is equally true, however, that those rights may be appropriately restricted inside prison walls: they must necessarily be limited by considerations relating to " 'the inordinately difficult undertaking' that is modern prison administration." *Thornburgh*, 490 U.S. at 407

205

(quoted source omitted). The law is thus well established that prison inmates retain their First Amendment and other constitutional rights only to the extent that they are not inconsistent with their status as prisoners or with the legitimate institutional needs and objectives of the corrections system. That is the balance that must be struck, and the parties differ as to the appropriate means of doing so.

## I. The Constitutional Test

The first issue—the appropriate legal analysis to be employed in evaluating Lomax's First Amendment claims—is wholly one of law, which we review independently. *Rock Lake Estates Unit Owners Ass'n v. Township of Lake Mills*, 195 Wis. 2d 348, 355, 536 N.W.2d 415, 418 (Ct. App. 1995).[3] Even in such cases, however, we have often recognized that we may benefit from the trial court's analysis of the issues. *State v. Eison*, 194 Wis. 2d 160, 178, 533 N.W.2d 738, 745 (1995). As may be seen, we benefitted greatly from Judge Nowakowski's thoughtful and well-reasoned legal rulings in this case.

The First Amendment claim put forth by Lomax is, in essence, that the articles he sent to the EDGE are the equivalent of a prisoner's outgoing mail, which enjoys

---

[3] We also proceed under the well-known rule that, in summary judgment cases, we consider the issues de novo, applying the same, equally well-known methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). Generally, summary judgment is appropriate in cases where there is no genuine issue of material fact and the moving party has established his or her entitlement to judgment as a matter of law. *Germanotta v. National Indem. Co.*, 119 Wis. 2d 293, 296, 349 N.W.2d 733, 735 (Ct. App. 1984).

heightened protection from interference under the Constitution. He grounds his argument on *Martinez*, 416 U.S. at 398, in which a group of prisoners sued various prison officials, claiming that rules authorizing censorship of the inmates' outgoing mail violated the First Amendment.[4] The standard outlined by the *Martinez* Court for assessing the constitutional validity of prisoner-mail censorship would permit such censorship only if (1) the practice furthers "an important or substantial governmental interest [that is] unrelated to the suppression of expression"; and (2) the limitation of First Amendment rights is "no greater than is necessary or essential to the protection of the particular governmental interest involved." *Martinez*, 416 U.S. at 413. Employing that analysis, the Court held the California rule invalid as "authoriz[ing] censorship of prisoner mail far broader than any legitimate interest of penal administration demands . . . ." *Id.* at 416.

The Court revisited the issue a few years later in *Turner v. Safley*, 482 U.S. 78 (1987), which involved a challenge to a Missouri administrative rule that barred correspondence between inmates at different correctional institutions (other than correspondence with immediate family members or relating to legal matters). The Court began by recognizing, as it had in *Martinez*, the need to balance two competing principles in determining whether prison regulations or actions

---

[4] Among other things, the rules authorized interception of letters (to persons other than lawyers or public officials) in which inmates "unduly complain[ed]," "magnif[ied] grievances," expressed "inflammatory" views or beliefs, discussed criminal activity or used language that was lewd, defamatory or "otherwise inappropriate." *Procunier v. Martinez*, 416 U.S. 396, 399-400 (1974), *overruled by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

violate constitutional rights: (1) confinement does not deprive prisoners of all constitutional rights;[5] and (2) the courts should accord considerable deference to the decisions of prison authorities in the "inordinately difficult" task of prison administration. *Id.* at 84-85. Discussing that deference, the *Turner* court said:

> A second principle identified in Martinez . . . is the recognition that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." As the Martinez Court acknowledged, "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.

*Id.* (citations omitted).

The Court then noted that none of the cases following *Martinez*[6] scrutinized the challenged regulations

---

[5] Included in the balance is, as we noted above, the principle that " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (quoted sources omitted).

[6] The cases are: *Block v. Rutherford*, 468 U.S. 576, 586, 589 (1984) (upholding ban on "contact visits" with inmates on grounds that "responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility," and regulation was

or actions as strictly as the *Martinez* Court did, but instead made a more limited inquiry, asking only whether the prison's actions were "'reasonably related' to legitimate penological objectives." *Turner*, 482 U.S. at 87. The Court went on to state:

> If [those succeeding cases] have not already resolved the question posed in Martinez, we resolve it now: when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators, and not the courts . . ., [are] to make the difficult judgments concerning institutional operations." Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration.

---

"reasonably related" to those concerns); *Bell v. Wolfish* 441 U.S. 520, 550, 551 (1979) (holding rule restricting inmates' receipt of books unless mailed directly from publishers or stores a "rational response" to an "obvious security problem" based on the judgment of prison administrators, whose "considered judgment . . . must control" in the situation presented); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 129, 130 (1977) (upholding regulation prohibiting meetings of "prisoners' unions" as "barely implicat[ing]" prisoners' First and Fourteenth Amendment rights and as "rationally related to the reasonable, indeed to the central, objectives of prison administration."); *Pell v. Procunier*, 417 U.S. 817, 827, (1974) (holding prison regulation prohibiting face-to-face media interviews with individual inmates to be a matter of judgment with respect to prison security which was "peculiarly within the province and professional expertise of corrections officials," to whom the courts should defer).

*Id.* at 89 (quoted sources omitted).

The *Turner* Court then set forth four factors it considered relevant in determining the reasonableness of a prison regulation claimed to impermissibly interfere with prisoners' constitutional rights: (1) whether there is a "valid, rational connection" between the regulation and the governmental interest justifying it;[7] (2) whether there are alternative means of exercising the right which remain open to inmates;[8] (3) whether accommodation of the asserted right will have an impact on guards and other inmates and prison opera-

---

[7] The Court noted in this regard: "Thus, a regulation will not be sustained where the . . . connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner v. Safley*, 482 U.S. 78, 89-90 (1987). The Court said that "the governmental objective must be a legitimate and neutral one." *Id.* at 90.

[8] According to the *Turner* Court, where such " 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (quoted sources omitted).

tions generally;[9] and (4) whether ready alternatives to the regulation or action exist.[10]

Applying those standards to the facts of the case, the *Turner* Court upheld the Missouri limitations on inmate correspondence as "reasonably related to valid corrections goals." *Id.* at 93. "The [prison's] rule," said the Court, "is content neutral, it logically advances the goals of institutional security and safety identified by Missouri prison officials, and it is not an exaggerated response to those objectives." *Id.*[11]

---

[9] Explaining this factor, the Court stated:

In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials.

*Turner*, 482 U.S. at 90.

[10] We discuss these standards in more detail in Part II, *infra*.

[11] Reviewing the evidence, the Court noted testimony that: (1) mail between institutions can be used to communicate and arrange prohibited activities and tends to exacerbate a growing problem with prison gangs which threatens the core prison functions of maintaining safety and internal security; (2) the regulation restricts only prisoner-to-prisoner correspondence and "does not deprive prisoners of all means of expression"; and (3) the monitoring of all inmate correspondence—the only alternative proffered by the inmates—would be costly and would be unlikely to detect jargon or codes containing the "real messages" of the correspondence. *Turner*, 482 U.S. at 91-93.

The *Turner* Court also reviewed a regulation prohibiting inmates from marrying except for "compelling reasons"—generally limited in practice to pregnancy or childbirth. *Id.* at 96. The Court, applying the standards just discussed, struck down the regulation as being not reasonably related to

The most recent case to consider the issue, *Thornburgh*, involved a challenge by a group of inmates and periodical publishers to a Federal Bureau of Prisons regulation authorizing prison officials to reject incoming publications determined to be " 'detrimental to the security, good order, or discipline of the institution or [that] might facilitate criminal activity.' " *Thornburgh*, 490 U.S. at 404 (quoted source omitted).

Considering once again the appropriate standard of review to be applied to prison regulations limiting access of noninmates (the publishers) to the prison population, the Court strictly confined *Martinez* to its facts, limiting its continued vitality solely to cases involving restrictions on private, outgoing inmate correspondence.[12] The Court stressed that the regulation in *Martinez* dealt only with outgoing letters, *"not matters circulated within the [prison] walls"*—matters that, according to the Court, "reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct."

---

legitimate security objectives in that it "sweeps much more broadly than can be explained by . . . penological objectives"—primarily because prison officials admitted that marriages had routinely been permitted at Missouri prisons in the past without incident or concern. *Id.* at 98-99.

[12] The Court stated:

> [A] careful reading of Martinez suggests that our rejection of the regulation at issue resulted . . . from our recognition that the regulated activity centrally at issue in that case—outgoing personal correspondence from prisoners—did not, by its very nature, pose a serious threat to prison order and security. We pointed out in Martinez that outgoing correspondence that magnifies grievances or contains inflammatory racial views cannot reasonably be expected to present a danger to the community *inside* the prison.

*Thornburgh v. Abbott*, 490 U.S. 401, 411-12 (1989) (emphasis in original).

*Thornburgh*, 490 U.S. at 411 n.10, 412 (emphasis in original). The Court then stated:

> [W]e acknowledge today that the logic of our analyses in Martinez and Turner requires that Martinez be limited to regulations concerning outgoing correspondence. As we have observed, outgoing correspondence was the central focus of our opinion in Martinez. The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials.

*Id.* at 413.

Then, criticizing the *Martinez* analysis as "failing to afford prison officials sufficient discretion to protect prison security," the *Thornburgh* Court concluded:

> [W]e now hold that regulations affecting the sending of a "publication" . . . to a prisoner must be analyzed under the Turner reasonableness standard. Such regulations are "valid if [they are] reasonably related to legitimate penological interests."

*Id.* (quoted sources omitted).

Applying the four *Turner* factors, the Court held that the regulation was valid, concluding: (1) the security interests underlying the rule were legitimate "beyond question," and the discretion granted prison officials by the regulation was "rationally related to [those] interests"; (2) other means of expression remained available to inmates in that the regulations, which prohibit only such materials as may be determined to implicate prison security and related penological interest, still "permit a broad range of publications to be sent, received, and read" by inmates; (3) accommodation of the asserted constitutional right

213

would have a substantial effect on other inmates and prison staff because circulation of the types of materials prohibited by the regulation would require the prison to greatly increase security provisions " 'at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike' ";[13] and (4) no " 'obvious, easy alternative' " to the regulation "ha[d] been established."[14] *Id.* at 414-18 (quoted sources omitted).

We agree with the trial court that subsequent decisions leave little question that the *Martinez* "strict scrutiny" rule is just as strictly limited to situations where the communication goes only one way out of the prison. If *Thornburgh* did not make that clear, a more recent case did, namely, *Washington v. Harper*, 494 U.S. 210 (1990).[15]

---

[13] In such an instance, said the Court, "courts should defer to the 'informed discretion of corrections officials.' " *Thornburgh*, 490 U.S. at 418 (quoted sources omitted).

[14] The *Thornburgh* plaintiffs proposed "tearing out the rejected portions" of the publications, and the Court, pointing to the trial court's finding that doing so would create more discontent than the practice under the rule, concluded that "when prison officials . . . have rejected a less restrictive alternative because of reasonably founded fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under Turner." *Thornburgh*, 490 U.S. at 419.

[15] *Harper* dealt with prison regulations and procedures relating to the administration of antipsychotic drugs to prisoners against their will. *Washington v. Harper*, 494 U.S. 210 (1990). The significance of the case for our purposes is the Supreme Court's reaffirmation of *Turner/Thornburgh*—particularly the following statement: "We made quite clear that the standard of review we adopted in Turner applies to all

Lomax sees it differently. He maintains that *Martinez* is an appropriate guide for our inquiry because of the small number of inmate subscribers to the EDGE, as compared to its overall circulation. This makes his situation, he says, the exact equivalent of an "outgoing mail" case. We disagree.

First, while it is true that Lomax sent his articles outside the prison, it is undisputed that he did so knowing that many copies of papers containing the articles would be sent into the prison and thus available to the general inmate population.[16] As the trial court noted, circulation of the articles among prison inmates was "not simply an inadvertent possibility" as far as Lomax was concerned, and their circulation among many

---

circumstances in which the needs of prison administration implicate constitutional rights." *Harper*, 494 U.S. at 224.

[16] In both the amended and supplemental complaints, Lomax alleged that the paper is distributed to approximately 90 "subscribers incarcerated within Wisconsin prisons." Lomax does not (1) dispute the State's assertion that, by his own admission, he knew that a considerable number of inmates, at Waupun, Racine and elsewhere, subscribed to the EDGE, or (2) take issue with the trial court's determination that Lomax's articles were sent to the EDGE "with the admitted and certain knowledge . . . that its contents would return to other inmates." We have long recognized that where an appellant fails to dispute assertions and propositions advanced by the respondent, they are considered to be confessed. *Schlieper v. DNR*, 188 Wis. 2d 318, 322, 525 N.W.2d 99, 101 (Ct. App. 1994); *State ex rel. Sahagian v. Young*, 141 Wis. 2d 495, 500, 415 N.W.2d 568, 570 (Ct. App. 1987).

We also note the statement in *Thornburgh*, to which we have referred earlier, that publications, like the *Edge*, that are "targeted to a general audience," once received by individual inmates, "reasonably may be expected to circulate among prisoners." *Thornburgh*, 490 U.S. at 412.

noninmate subscribers as well "does not erase this reality."[17]

Unlike the situation in *Martinez*, Lomax's avenue of communication was not a one-way street. This is not a "single audience" case, as was *Martinez*, which involved restrictions placed solely of inmates' private correspondence with individuals outside the prison. Rather, as the trial court concluded, this is a "dual audience" case in which the recipients of the communication are comprised of both noninmates and inmates alike. As we noted above, Lomax was well aware that

---

[17] Lomax correctly points out the *Martinez* Court's statement that "In the case of direct personal correspondence between inmates and those who have a particularized interest in communicating with them, mail censorship implicates more than the rights of prisoners." *Martinez*, 416 U.S. at 408 (footnote omitted).

Subsequent cases, however, have not hesitated to apply the more deferential "reasonable relation" *Turner/Thornburgh* standard in situations where noninmate interests were similarly implicated. *Thornburgh* dealt with restrictions on general publications sent into the prison, and the Court, noting the probability that, though sent to individual inmates, the publications subject to the regulation could be expected to circulate among prisoners "with the concomitant potential for coordinated disruptive conduct," concluded, "In the volatile prison environment, it is essential that prison officials be given broad discretion to prevent" the types of problems such circulation might cause within the prison. *Thornburgh*, 490 U.S. at 412-13. See also *Pell*, 417 U.S. at 827, where, as we noted, *supra* note 6, the Court upheld a rule prohibiting press and media interviews with individual prisoners as "peculiarly within" the discretion and professional expertise of prison officials.

his articles, once published, would circulate in his own prison and others around the state.[18]

The only case we have found directly addressing the "dual audience" question is a federal district court case, *Martin v. Rison*, 741 F. Supp. 1406 (N.D. Cal. 1990), *vacated as moot*, *Chronicle Publishing Co. v. Rison*, 962 F.2d 959 (9th Cir. 1992), *cert. denied*, 507 U.S. 984 (1993).[19] And while federal circuit and district court cases are not binding on state courts,[20] we have not hesitated to adopt the reasoning of federal lower-court decisions that we consider persuasive on a particular question. *See State v. Boettcher*, 144 Wis. 2d 86, 96-97, 423 N.W.2d 533, 538 (1988); *Streff v. Town of Delafield*, 190 Wis. 2d 348, 356-57, 526 N.W.2d 822, 825 (Ct. App. 1994). We think *Martin* is such a case.

Martin, who was incarcerated in a federal penitentiary in California, wrote a regular column for the SAN FRANCISCO CHRONICLE, a major newspaper in general circulation. His columns, some of which were critical of prison conditions and officials, like Lomax's, were generally well received by the public. When copies of the CHRONICLE containing one of the columns, which was entitled "The Gulag Mentality" and centered on

---

[18] We think Lomax's knowledge in this regard is significant because he was found to have violated DOC rules regarding the conduct of prisoners and safety concerns within the prison. Had he made his comments in private correspondence directed solely to persons outside the walls, different considerations would be presented and his *Martinez* argument would be more persuasive.

[19] This decision was vacated as moot because Martin was released on parole.

[20] U.S. Supreme Court decisions on federal questions are, of course, binding on state courts at all levels. *State v. Mechtel*, 176 Wis. 2d 87, 94-95, 499 N.W.2d 662, 666 (1993).

murders, assaults, and possible violence or rioting in the prison, were sent into the prison, Martin was placed in temporary "detention" for several days while prison officials conducted an investigation. He was eventually subjected to disciplinary action and was transferred to another institution. He sued, claiming that the prison's actions, and the regulations on which they were based,[21] violated his First Amendment rights. The district court disagreed, concluding that, under the *Turner/Thornburgh* analysis, the regulations—and the prison's actions—were "rationally related to the legitimate penological objective of prison security." *Martin*, 741 F. Supp. at 1417. In adopting the *Turner/Thornburgh* standard—and rejecting Martin's argument that *Martinez* should apply because his columns were communications directed outside the prison—the court stated:

> [I]n the present case we are not dealing exclusively with outgoing communications, as was *Martinez*. Here, the outgoing communications were newspaper articles which were then revised, published, and redistributed back into the prison. Indeed, the consequences of the writings were not created by sending them out, but by their publication and distribution back into the prison. Because of both that factual distinction and the Supreme Court's recent pronouncements in *Turner*, [*Thornburgh v.*] *Abbott*,

---

[21] The regulations prohibited inmates from conducting a business while confined and from receiving compensation for "correspondence with the news media." They also specifically prohibited inmates from "act[ing] as a reporter or publish[ing] under a byline." *Martin v. Rison*, 741 F. Supp. 1406, 1410 (N.D. Cal. 1990), *vacated as moot, Chronicle Publishing Co. v. Rison*, 962 F.2d 959 (9th Cir. 1992), *cert. denied*, 507 U.S. 984 (1993).

and *Harper*, this court concludes that the *Martinez* standard is not the one applicable here.

*Id.* at 1412-13. We agree with the district court's analysis and conclusion, and we proceed to apply the *Turner/Thornburgh* factors to this case.

## II. Application of the Test

Lomax challenges the first factor, that a valid, rational connection exists between the prison's actions and a legitimate governmental or penological interest. He argues prison authorities have no legitimate interest in preventing dissemination of information and opinions about prison conditions from inmates to the general public, "no matter how uncomplimentary or inflammatory the views expressed may be." And he contends considerations of prison security cannot justify the prison's actions in this case because "prison security is not ordinarily implicated by outgoing mail."

The trial court found the references in Lomax's "Chronicle" article—particularly those stating Officer Garro's "hard-ass" personality constituted "an open invitation for a shiv in the back," and that he "fully concur[red]" with such a result—"creat[ed] precisely the rational relation between the defendants' interest in the safety of [their] guards and the actions they took."

While persons outside the prison—including some or all members of this court—might read Lomax's articles differently,[22] perceiving no serious threats in his prose, that, as we have said, is not the question. As the Supreme Court recognized, because the " 'complex and

---

[22] In the summary judgment proceedings in the trial court, Lomax submitted affidavits of journalists and others indicating they did not read any threats or incitements into either article.

intractable' " problems inherent in prisons and their administration are " 'not readily susceptible of resolution by [judicial] decree,' " courts should defer to the informed judgment of prison administrators on such issues. *Turner*, 482 U.S. at 84 (quoted source omitted). As the Supreme Court said in *Thornburgh*:

> [W]e have been sensitive to the delicate balance that prison administrators must strike between the order and security of the internal prison environment and the legitimate demands of those on the "outside" who seek to enter that environment, in person or through the written word. . . . [And while many] claims to prison access undoubtedly are legitimate . . . prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.

*Thornburgh*, 490 U.S. at 407-08 (citations omitted).[23]

---

[23] By their very nature, courts are ill suited " 'to deal with the increasingly urgent problems of prison administration' " and "[b]ecause the realities of running a penal institution are complex and difficult," decisions of prison administrators are entitled to "wide-ranging deference." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 126 (1977) (quoted source omitted). Such deference is appropriate because to do otherwise would "seriously hamper" prison officials in dealing with the "intractable problems" of prison security and administration,

220

In this case, a variety of persons knowledgeable in the field of prison administration testified to the relationship between Lomax's articles and issues of prison security.

There was testimony, for example (in the form of affidavits and answers to requests for admission), that the "Chronicle" article implicated Garro's personal security within the Waupun prison to the extent that, as a result of the article, her duties—particularly those involving contact with inmates—were temporarily restricted "for her safety." Some officials believed the article could be read by inmates as an "invitation" or a "call to action" to harm her. Others said that, in the prison setting, the article could, at a minimum, encourage inmates to "threaten, be disrespectful and lie about staff."

Similarly, the "Mice and Men" article was said to create a security risk by undermining the authority of the Racine prison security director and his staff. One witness stated, for example, "Disrespect and lying about staff cannot be tolerated because they cause the erosion of authority within an institution and therefore the security of both staff and inmates are placed at risk." Another said the failure to discipline an inmate for making threats, being publicly disrespectful to, and lying about prison staff "would encourage such behavior among others and create the risk of serious disruption at the institution." The Racine warden stated that Lomax's lies and public expression of disrespect toward Ellerd undermined staff ability to

---

making "every administrative judgment . . . subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand." *Turner*, 482 U.S. at 89.

"maintain security, peace, and order within the institution."

Again, others may disagree with those judgments. But under clear Supreme Court precedent, they are judgments committed in the first instance to corrections professionals, not the courts, and we are bound by decisions of the nation's highest court to defer to those judgments unless they are so remote from, and unconnected to, any legitimate correctional or penological interests as to be arbitrary or irrational. *Turner*, 482 U.S. at 89-90. Lomax simply has not made such a showing in this case.

The second *Turner/Thornburgh* factor—whether alternative means of exercising First Amendment rights remain open to Lomax and other inmates—need not detain us long. First, Lomax does not argue to the contrary. Second, it is apparent from the record that Lomax had written many articles for the EDGE for which he was not disciplined—including articles critical of the Department of Corrections and the conditions of prison confinement in Wisconsin. The prison's actions related only to two of his articles which contained material considered by DOC authorities as implicating security interests at the prison.

Lomax—and other prisoners—are free to communicate with others, and even to write for "outside" publications circulated back to the prison, on whatever subjects they choose, including activities, occurrences and conditions within the prison system. It is only when exercise of the constitutionally granted right to do so has such a bearing on legitimate penological or correctional interests that prison authorities may impose restrictions—and then only such restrictions as may be said to be reasonably related to those interests.

In this case, it is a fact that, of his many published articles, the only ones for which Lomax was disciplined were the two that, as the trial court determined, were written with the knowledge that they would be disseminated inside the prison, and which may be read as condoning or advocating violence and were rife with name-calling and false accusations against prison officials.[24] As the trial court pointed out:

> Lomax has had and continues to enjoy considerable, alternative means of exercising his right to comment in writing on prison conditions. He has written a regular column [for] THE MADISON EDGE which has included articles critical of a number of DOC practices and policies for which he has received no discipline. To the extent he writes future articles which do not condone or justify vio-

[24] The trial court said, for example:

"Chronicle of a Death Foretold" . . . if not actually urging violence against a particular prison guard, condones or justifies such violence. Moreover, its discussion of the "hard-ass guard" phenomenon could reasonably be read by inmates as condonation or justification for taking violent action against any other guard that an inmate might conclude fell in the category of being a "hard-ass." That the article could reasonably be read in these ways is reinforced by the opinions of prison officials presented on this motion which, under the *Turner/Thornburgh* standard are to be accorded considerable deference. . . .

In the "Of Mice and Men" article, Lomax calls . . . Ellerd "one of the slimiest correctional officials I've ever known" and "a thoroughly sadistic, deceitful unscrupulous wretch." He accused Ellerd of a number of acts ranging from ones clearly illegal . . . to ones morally abhorrent. Unflattering, bad taste and even profane speech by a non-inmate may well be protected by the First Amendment's protection of robust debate, but in a prison setting such speech directed at or about prison officials implicates legitimate concerns for security because it undermines the authority of such prison officials, which is vital to the effective functioning of a correctional facility.

lence, which do not engage in name-calling toward prison officials, and which do not include knowingly false accusations, there is no evidence that he will be disciplined for them.[25]

Thus, the exercise of First Amendment rights by Lomax or other inmates that do not implicate valid institutional security or other interests are in no way restricted, nor can they be made the subject of disciplinary proceedings.

The third factor—whether accommodation of the asserted right will have a significant "ripple" effect on other inmates or prison staff—is a determination to which, under *Turner*, courts should be "particularly deferential." *Turner*, 482 U.S. at 90. As we discussed above, there was evidence from corrections professionals that permitting inmates to show disrespect for prison officers and falsely accuse them of illegal acts—or condone or advocate violence against them—can adversely affect the entire fabric of prison order. Because we are not persuaded that determination lacks a rational basis, we may not disturb it.

The final factor, the "absence of ready alternatives" to the action taken, was discussed as follows in *Turner*:

[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation. By the

---

[25] The court also pointed out that because the *Martinez* strict-scrutiny analysis retains its vitality with respect to communications "exclusively directed to those outside the prison," Lomax will be "free to express an even wider range of views in an even more caustic manner when his outgoing correspondence is so directed."

same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. . . . [I]f . . . inmate[s] . . . can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90-91 (citations and quoted sources omitted).

Lomax argues that the prison's action fails this standard, claiming the conduct reports constituted an "exaggerated response" to the problem, and that the prison has the "ready" alternative of censoring all publications coming into the prison and excising offensive lines, in order to keep comments such as those made in his articles from reaching inmates. Conceding that the alternative "may not be foolproof," Lomax points out that censorship of incoming materials is a common practice in prisons.

Respondents, on the other hand, emphasize such censoring proved ineffective in this case when, even after the person tried to block the material by censoring the article in each inmate's paper, a civilian teacher brought in copies and posted them on bulletin boards. They also suggest that copies of the articles could be mailed into the institution in letters, and that opening and screening all prisoner mail in a large institution would be "a daunting and expensive project" that would not operate at a "de minimis" cost and would, by its very nature, "entail negative implications on the delivery of mail to all inmates."

As we noted above,[26] the *Thornburgh* Court faced a situation similar to the one here, in which the alternative proposed by the plaintiffs involved prison staff interception of all incoming publications and removal of offensive portions. *Thornburgh*, 490 U.S. at 406. The Court rejected the alternative and upheld the prison's restrictions on incoming publications on the basis that the plaintiffs' proposal would have more than a de minimis impact on prison administration and operations. *Id.* at 419. Similarly, in *Turner*, the Court said that a suggested alternative to the inmate correspondence prohibition—having the prisons "monitor" such correspondence—"clearly would impose more than a de minimis cost on the pursuit of legitimate corrections goals."[27] *Turner*, 482 U.S. at 93.

■

Lomax has not satisfied us that incoming mail/publication censorship is an "alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." *Id.* at 90-91.

■

We conclude, as did the trial court, that consideration of the *Turner/Thornburgh* factors defeats Lomax's constitutional claims.

---

[26] *See supra* note 14.

[27] The *Turner* Court noted the "impossib[ility]" of reading every piece of inmate-to-inmate correspondence, the "appreciable risk of missing dangerous messages," and the "sheer burden on staff resources required to conduct item-by-item censorship," as "support[ing] the judgment of prison officials that this . . . is not an adequate alternative to restricting correspondence." *Turner*, 482 U.S. at 93.

### III. Existence of a Disputed Material Fact

Alternatively, Lomax argues that even if *Turner/Thornburgh* is the applicable rule in this case, the entry of summary judgment was still improper because of a disputed material fact with respect to one of the *Turner/Thornburgh* factors, namely, the requirement that a "rational connection" exists between the prison's action and legitimate penological interests. Lomax argues that the affidavit of one of the prison administrators, Terri Landwehr, discussing the possible and probable effects on prison security resulting from circulation of his articles, was belied by her own actions, thus creating an issue of fact in the form of a "conflict between [her] words and . . . actions." In other words, Lomax contends an issue of fact exists as to Landwehr's credibility.

Landwehr was one of several prison officials providing affidavits on the relationship between Lomax's articles and legitimate prison security objectives. She believed that "Chronicle" was a threat to security because it could be considered as "an invitation" to other inmates to harm Garro, and that "Mice and Men" encouraged prisoner unrest and "undermine[d] the authority" of the security director and his staff. Lomax points out that, shortly after "Chronicle" was published, Landwehr issued a press release criticizing the article as an "effort to encourage inmate unrest," and as "promot[ing] disobedience, disrespect or murderous assaults on unarmed prison staff." Asserting that the press release was sent to several newspapers, including those with inmate subscribers, Lomax argues Landwehr's comments go further than his own articles in fomenting prison unrest and the only "logical conclusion" from this is that Landwehr "did not actually believe that Lomax's opinions about Garro and inmate

violence . . . posed a significant threat to the orderly operation of the prisons."

■

Even if we were to consider Landwehr's press release as raising a "factual" credibility issue *vis-a-vis* her affidavit, hers was but one of several affidavits relating to the relationship between Lomax's articles and security interests at Waupun and Racine. Thus, even ignoring her affidavit, the record contains ample undisputed evidence on the point to support the conclusion that a rational connection exists between the prison's actions in this case and legitimate penological interests.

## IV. Sufficiency of the Evidence Before the Committee

Lomax frames his final challenge to the disciplinary committee's action in an unusual manner. He argues the evidence was insufficient for the committee to find him guilty of disrespect, but he does not advance the argument on due-process grounds.[28] Rather, he appears to put forth an unconstitutional-as-applied argument: that applying the rule to him in the absence of sufficient evidence to support a finding of guilt violates his First Amendment rights. This argument is, as

---

[28] As the State points out, the traditional due-process avenue for challenging the sufficiency of the evidence before a prison disciplinary committee, *see Superintendent, Mass. Correctional Inst. v. Hill*, 472 U.S. 445, 454 (1985); *Irby v. Macht*, 184 Wis. 2d 831, 845, 522 N.W.2d 9, 14-15, *cert. denied*, 115 S. Ct. 590 (1994), is probably foreclosed to Lomax in light of the well-recognized rule that random and unauthorized procedural due-process violations in prison disciplinary proceedings are not actionable under 42 U.S.C. 1983. *Irby*, 184 Wis. 2d at 835-36, 522 N.W.2d at 10-11.

the State points out, largely a rehash of his earlier claim that all he did was mail the articles out of the prison—that he had nothing to do with printing them and sending them back in. Whatever legal or constitutional underpinnings he attempts to construct for the argument, it remains a challenge to the sufficiency of the evidence and we therefore reject it.

Lomax grounds his argument on a statement in the "disrespect" rule, WISCONSIN ADM. CODE § DOC 303.25: "Disrespect does not include . . . criticism of [staff] expressed through the mail" and he claims that is all he did.

There is no question—and Lomax does not seriously argue to the contrary—that, had he circulated the articles inside the prison, their contents would have constituted disrespect within the meaning of the rule.[29] As we already recognized, this is not an "outgoing mail" case. The disciplinary committee found that Lomax knowingly made his statements "in a forum that he knew would be read by inmates and staff within [the institution]." Both the committee and the trial court concluded it was not Lomax's mailing of the article that implicated security concerns but his mailing it with the certain knowledge that it would be sent to, and read by, inmates at Waupun, Racine and other Wisconsin correctional institutions. As the trial court noted, that was not an inadvertent result; it was an

---

[29] WISCONSIN ADM. CODE § DOC 303.25, prohibits inmates from "overtly show[ing] disrespect for any person performing his or her duty as an employe[e] of the state of Wisconsin . . . ." And it defines "disrespect" as including, but not limited to, "derogatory or profane writing, remarks or gestures . . . and other acts intended as public expressions of disrespect for authority and made to other inmates and staff."

intentional act. Lomax's "as-applied" First Amendment argument is unavailing.

*By the Court.*—Judgment affirmed.