WISCONSIN COALITION FOR VOTER PARTICIPATION, INC., a Wisconsin nonstock corporation, James M. Wigderson, Brent J. Pickens, and Mark Block, Plaintiffs-Appellants,†

v.

STATE OF WISCONSIN ELECTIONS BOARD, Michael Brennan, Christine Wiseman, J. Curtis McKay, David Halbrooks, Randall Nash, Don Millis, Gregory Paradise and Judd Stevenson, Individually and in their Official Capacity as Members of the Wisconsin Elections Board, and Kevin J. Kennedy, its Executive Director, Defendants-Respondents.

Court of Appeals

*No. 99–2574. Oral argument November 16, 1999.—Decided November 26, 1999.*

(Also reported in 605 N.W.2d 654.)

†Petition to review dismissed.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Raymond P. Taffora* and *Eric M. McLeod* of *Michael, Best & Friedrich* of Madison, and *Michael P. Crooks* of *Peterson, Johnson & Murray* of Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *James E. Doyle,* attorney general, with *Alan Lee,* assistant attorney general.

Before Eich, Nettesheim and Fine, JJ.

¶ 1.   EICH, J.   The Wisconsin Coalition for Voter Participation, Inc., James M. Wigderson, Brent J. Pickens and Mark Block, appeal from a summary judgment dismissing their action against the Wisconsin Elections Board, its members and executive director. According to the Coalition's bylaws, it is a non-profit, non-stock corporation organized "for the purpose of receiving and disbursing funds to increase, on a non-partisan basis, voter registration and participation in

673

any election." Wigderson and Pickens are affiliated with the Coalition, and Mark Block was the manager of Justice Jon P. Wilcox's campaign for election to the Wisconsin Supreme Court in the April 1997 election.

## Background

¶ 2.   Plaintiffs sued to enjoin the Elections Board from investigating connections between the Coalition and the Wilcox campaign with respect to the Coalition's mailing, just prior to the election, of approximately 354,000 postcards containing brief statements about Wilcox and his opponent in the election, Attorney Walter Kelly. In addition to the injunction and unspecified money damages, plaintiffs sought a declaration that the mailing did not violate any of Wisconsin's election laws or administrative rules. They claimed that, for several reasons, the Coalition's activities were not subject to regulation by the Board.

¶ 3.   The circuit court granted the Board's motion for summary judgment dismissing the action, concluding that the Board had authority to conduct its investigation, and plaintiffs appealed. We temporarily stayed enforcement of the circuit court's order pending oral argument on plaintiffs' request to stay all proceedings pending our final decision in the case. In our order scheduling the argument, we directed the parties to provide us with copies of all circuit court briefs and an appendix containing all matters of record relied on in those briefs. We stated in the order that we anticipated we would proceed to decide the merits of the appeal based on these submissions and the oral argument.[1] We do so now.

---

[1] None of the parties has objected to that procedure.

## Decision

¶ 4.  We are satisfied that the circuit court was correct in dismissing plaintiffs' action and we affirm its order. Consistent with the provisions of our November 5, 1999, scheduling order, the temporary stay will expire at 4:30 p.m. (C.S.T.) on December 1, 1999.

## Discussion

¶ 5.  The facts are undisputed. The Coalition was incorporated on March 13, 1997. Shortly before the election on April 1 of that year, the Coalition, apparently having raised funds for that purpose, printed and mailed the cards to approximately 354,000 Wisconsin residents. The cards encouraged the recipients to vote in the supreme court election and then stated:

Your choices for the Supreme Court are:

• **Jon Wilcox:**   5 years experience on the Wisconsin Supreme Court; 17 years as a judge.

• **Walt Kelly:**   25 years as a trial lawyer; A CLU special recognition award recipient.

Let your voice be heard! These issues are too important to ignore. Your vote is critical. *Please remember to vote next Tuesday, April 1st.*

¶ 6.  Justice Wilcox won the election. Shortly thereafter, Kelly filed a complaint with the Elections Board alleging that the postcards, which were printed at an estimated cost of $135,000, contained no disclaimer identifying who had paid for them, and that no reports had been filed by either the Coalition or the Wilcox campaign with respect to the mailing. The complaint went on to allege that the text of the

cards—notably the reference to Kelly's ACLU award—was "nearly identical" to the content of television and radio commercials produced by the Wilcox campaign and that they were printed by a company that had been working with the campaign organization. Kelly asked the Board to investigate the expenditure.

¶ 7. After receiving the complaint, the Board began an investigation into Kelly's allegations. As part of that investigation, the Board wrote to the individual plaintiffs, indicating that it planned to issue subpoenas for records of telephone calls made by them during the period January 1 - May 31, 1997, for the purpose of "identify[ing] any contacts between persons associated with the . . . Coalition . . . and persons representing the . . . Wilcox [campaign organization]." The Board also indicated that it planned to take the plaintiffs' depositions with respect to the telephone records.

¶ 8. Plaintiffs then commenced this action, seeking a declaration that: (1) because the postcards were not disseminated for "political purposes," the Board lacked authority to investigate the Coalition's activities; (2) in the absence of a "threshold legal determination that the [cards] constitute 'express advocacy' " within the meaning of *Buckley v. Valeo*, 424 U.S. 1 (1976), the Board's investigation was improper; and (3) the subpoenas violated plaintiffs' rights to free speech and association under the First Amendment. As indicated, plaintiffs also sought to permanently enjoin the Board from continuing such an investigation.

¶ 9. Plaintiffs moved for judgment on their complaint and the Board moved for summary judgment dismissing the action. In support of their motion, plaintiffs argued that, under *Buckley*, political "speech" is protected by the First Amendment and may not be

676

regulated unless it constitutes "express advocacy" on behalf of a particular candidate. *Id.*, 424 U.S. at 44. And they asserted that the postcards did no such thing—that their message didn't expressly advocate the election of one candidate over another. According to plaintiffs, the message on the cards was no more than a "discussion of issues and candidates" which, they said, enjoys constitutional protection. The Board argued that "express advocacy" was not an issue in the case—that it was seeking only to determine whether the Coalition's mailing was undertaken in concert or consultation with the Wilcox organization and thus might be considered an unreported and illegal in-kind contribution to the justice's campaign.[2]

¶ 10.   As indicated, the circuit court granted the Board's motion. It concluded that the *Buckley* "express advocacy" requirement related only to portions of the federal election law (the law at issue in *Buckley*) relating to "expenditures" made on a candidate's behalf, not to contributions made to the candidate's campaign.[3] The court went on to conclude that the Board could properly investigate whether the mailing should be considered an in-kind contribution to the Wilcox cam-

---

[2] As we discuss below, in-kind contributions to campaigns are reportable just as cash contributions are. *See* §§ 11.01(6)(a)1 and 11.12(1)(a), STATS., and WIS. ADM. CODE § ElBd 1.20(1)(e). Additionally, in supreme court races, individual contributions are limited to $10,000, § 11.26(1)(a), STATS., and Kelly's complaint alleged that the Coalition spent more than $130,000 on the mailing.

[3] As will be seen, after *Buckley v. Valeo*, 424 U.S. 1 (1976), the Wisconsin Legislature included the term "express advocacy" in certain sections of the campaign finance law.

paign under applicable election laws and administrative rules.[4]

¶ 11. We, of course, review the circuit court's decision *de novo*, as it involves a question of law: the application of statutes and administrative rules to the undisputed facts. *State v. Michels*, 141 Wis. 2d 81, 87, 414 N.W.2d 311, 313 (Ct. App. 1987).[5]

¶ 12. Plaintiffs renew their "express advocacy" argument on appeal and urge us to rule that the circuit court wrongly dismissed their action. Referring us first to language in *Buckley* indicating that the First Amendment precludes regulation of any political speech that does not "in express terms advocate the election or defeat of a clearly identified candidate," *id.*, 424 U.S. at 44, and then to § 11.04, STATS., which provides that the state campaign finance laws don't apply to non-partisan get-out-the-vote campaigns "that are not directed at supporting or opposing any specific candidate," plaintiffs assert that the postcards can't be considered advocacy in any sense of the term. While we may or may not agree with that assertion, we do agree

---

[4] With respect to plaintiffs' First Amendment claim, the court found that a "compelling state interest" exists in the disclosure and regulation of contributions to candidates for public office. It went on to rule, however, that the issue was premature because, in the absence of specific questions or inquiries put to the subpoenaed witnesses, it could not properly balance that interest against possible infringement of the witnesses' rights. It therefore left resolution of that issue to possible future proceedings.

[5] We have often recognized, however, that we may, and often do, benefit from the trial court's analysis of the issues. *Lomax v. Fiedler*, 204 Wis. 2d 196, 206, 554 N.W.2d 841, 844–45 (Ct. App. 1996). This is such a case. We have found the circuit court's thoughtful, well-reasoned decision quite helpful to our own analysis of the issues.

with the circuit court that express advocacy is not an issue in this case.

¶ 13.   Plaintiffs are correct in their reference to *Buckley* as holding that independent expenditures that do not constitute express advocacy of a candidate are not subject to regulation, and § 11.04, STATS., says pretty much the same thing. But neither *Buckley* nor § 11.04 limit the state's authority to regulate or restrict campaign contributions. Indeed, § 11.06(2), STATS., states that disbursements made by independent organizations (such as the Coalition) which "*do[ ] not constitute a contribution to any candidate*" are required to be reported "*only if* the purpose is to expressly advocate the election or defeat of a clearly identified candidate . . . ." Conversely, contributions to a candidate's campaign must be reported *whether or not* they constitute express advocacy. *See* § 11.06(1). The Coalition's expenditure for production and mailing of the postcards, concededly, was not reported by the Wilcox committee; and, if it could be considered a contribution to Wilcox's campaign, it would far exceed the legal contribution limit for supreme court elections. *See, supra* note 2. The result is that if the mailing was a contribution—which is what the Board is seeking to determine—it was illegal regardless of how one might interpret the postcards' language.[6]

---

[6] At oral argument counsel for one of the individual plaintiffs suggested that the cards, because of what he asserted was the neutrality of their message, would not serve the Wilcox campaign effort very well. Effectiveness, however, is not a given in political advertising. Some of Michael Dukakis's aides may well have thought that photographs of the governor's helmeted head peering out of a tank turret would garner him thousands of votes in the 1988 Presidential election. They did not.

¶ 14.   A contribution, under the law, is "[a] gift . . . of money or anything of value . . . made for political purposes." Section 11.01(6)(a)1, STATS. And while, as plaintiffs point out, "express advocacy" on behalf of a candidate is one part of the statutory definition of "political purpose," it is not the only part. Under § 11.01(16), STATS., for example, an act is also done for a political purpose if it is undertaken "for the purpose of influencing the election . . . of any individual . . . ."[7] Indeed, the administrative rule setting forth disclosure and recordkeeping requirements for persons making contributions for political purposes, defines the latter term to specifically include "contributions made to . . . a candidate or . . . a political committee." WIS. ADM. CODE § ElBd 1.28(1)(b).

¶ 15.   Contrary to plaintiffs' assertions, then, the term "political purposes" is not restricted by the cases, the statutes or the code to acts of express advocacy. It encompasses many acts undertaken to influence a candidate's election—including making contributions to an election campaign. And, political contributions may be made "in kind" as well as in cash. WISCONSIN ADM. CODE § ElBd 1.20(1)(e) defines an in-kind contribution as a "disbursement by a contributor to procure a thing of value or service for the benefit of a [candidate or committee] who authorized the disbursement." And the code requires campaign organizations to report the receipt of in-kind contributions, just as they are required to report cash contributions.

¶ 16.   As indicated, the Board's investigation seeks to ascertain the existence of contacts between the

---

[7] We note in this regard that the "express advocacy" language in the statute appears immediately below the following admonition: "Acts which are for 'political purposes' *include but are not limited to*: . . . " (Emphasis added.)

Wilcox campaign and the Coalition with respect to the mailing in order to determine whether the reporting or other provisions of the campaign finance laws may have been violated by either entity. Under WIS. ADM. CODE § ElBd 1.42(2), a voluntary committee such as the Coalition[8] is prohibited from making expenditures in support of, or opposition to, a candidate if those expenditures are made "in cooperation or consultation with any candidate or . . . committee of a candidate . . . and in concert with, or at the request or suggestion of, any candidate or . . . committee" and are not reported as a contribution to the candidate. These provisions are consistent with the federal campaign finance laws approved by the Supreme Court in *Buckley*—laws which, like our own, treat expenditures that are "coordinated" with, or made "in cooperation with or with the consent of a candidate . . . or an authorized committee" as campaign contributions. *Id.*, 424 U.S. at 46–47, 78.

¶ 17. Kelly's complaint to the Board noted that the postcard message—notably the reference to Kelly's ACLU award—was nearly identical to messages in other Wilcox campaign materials and advertisements. The complaint also alleged that the cards were printed at the direction of a firm employed by the campaign for other projects, further suggesting a connection to the campaign.

---

[8] WISCONSIN ADM. CODE § ElBd 1.42 applies to "committee[s] filing the voluntary oath specified in s. 11.06(7), Stats." The rule was cited in the circuit court's decision and was discussed at some length at oral argument. And while plaintiffs maintain that the provisions of the rule don't control the result in this case, they have not disputed in either forum its application to the facts of this case on grounds that the Coalition is not a "voluntary oath committee" subject to its terms.

¶ 18.    There is little doubt that had the Coalition given 354,000 blank paid postcards to the Wilcox campaign committee, allowing it to put whatever message it wished on them, this would have been a reportable contribution. And we agree with the Board that the same would be true if the Coalition had done the mailing itself, after asking the campaign what message it would like to place on the cards—or even if the campaign had solicited the Coalition to mail the cards with the message already printed. If there was consultation or coordination with the Wilcox campaign, it makes no difference that the chosen message was printed by the Coalition rather than by the campaign itself. As we have noted above, we think the Board was correct in observing (in one of its briefs to the circuit court) that "[i]f the mailing and the message were done in consultation with or coordinated with the Justice Wilcox campaign, the [content of the message] is immaterial."

¶ 19.    Plaintiffs next argue that investigating the existence of a connection between the Coalition and the Wilcox campaign impermissibly invades the Coalition's members' rights to freedom of (political) speech. Specifically, they claim that "disclosure of the circumstances surrounding [the Coalition's] production and distribution of the . . . Postcards and, in particular, [its] contacts and contributors involved in that effort," would "constitute a serious infringement on the individual plaintiffs' First Amendment rights." There is little doubt, however, that if such a connection is established, the Coalition's mailing would constitute an unreported gift to the campaign in violation of various state election laws; and plaintiffs have not pointed us to any authority suggesting how the First Amendment

may be interposed to bar an otherwise appropriate investigation into possible violations of the state's election reporting and contribution laws. Indeed, the Supreme Court, in *Buckley*, specifically upheld the federal act's regulation of campaign contributions against charges that such regulation unconstitutionally infringed on the contributors' First Amendment rights of speech *and* association. *Id.*, 424 U.S. at 28–29.

¶ 20.   Plaintiffs also raise § 11.04, STATS., as a bar to the Board's investigation. The statute provides (with exceptions not relevant here) that the campaign finance laws "do not apply to non-partisan campaigns to increase voter registration or participation at any election that are not directed at supporting or opposing any specific candidate . . . ." Pointing to the Coalition's ostensible status as a group engaged solely in a non-partisan get-out-the-vote effort, and to what they again claim is the cards' neutral, non-advocacy message, plaintiffs claim that § 11.04 renders all campaign finance laws inapplicable to the Coalition's endeavors. As we have stressed earlier in this opinion, the issue before us has nothing to do with the Coalition's partisan or non-partisan status, or the content of its mailing. It concerns only the Board's investigation into whether the Coalition—no matter what purpose it was organized for, and no matter whether some, many, or most people might think the message on the cards wasn't advocating one candidate over the other—made an unreported in-kind contribution to the Wilcox campaign. We do not see § 11.04 as barring the Board's investigation.

¶ 21.   Finally, plaintiffs argue that we should enjoin the Board's investigation into whether the Coalition's mailing was undertaken in consultation or

coordination with the Wilcox campaign because those terms are ambiguous. Citing *Elections Board v. WMC*, 227 Wis. 2d 650, 597 N.W.2d 721 (1999), plaintiffs maintain that "absent specific [statutory or administrative] rules which define and govern 'coordination' [between the Coalition and the Wilcox campaign] under these circumstances, the Board's investigation constitutes a violation of [plaintiffs'] due process rights."

¶ 22.  In *WMC*, the Manufacturers & Commerce association ran a series of television advertisements describing certain votes of incumbent legislators who were seeking reelection, and encouraging viewers to call the legislators to express their approval or disapproval of those votes. On the legislators' complaint, the Board issued an order finding that the ads constituted "express advocacy" of the defeat of the named legislators and directing WMC to register with the Board and file reports of all contributions received and all disbursements made. When WMC refused to do so, the Board filed an action in circuit court alleging that WMC's ads constituted express advocacy within the meaning of *Buckley*, and that, as a result, WMC was in violation of various campaign registration and reporting laws. The Board sought civil forfeitures from WMC and an injunction barring broadcast of the ads. The trial court dismissed the action and the supreme court affirmed. In the supreme court's view, the Board, by proceeding against WMC based on a "context-based" express-advocacy standard—looking at the ads based upon the context in which they were broadcast in order to determine, on a case-by-case basis, whether that context suggested that they were "unambiguously related to the campaign[s] of . . . particular candi-

date[s]"[9] —was engaging in an after-the-fact effort to create a "new" definition of "express advocacy" that was broader than the *Buckley* standard which, the court said, had been the law of Wisconsin at the time WMC placed the ads. *WMC*, 227 Wis. 2d at 671, 677, 597 N.W.2d at 732, 734. The court considered this to be the equivalent of "retroactive rule-making" on the Board's part which, it said, would be "profoundly unfair" to WMC in the absence of any advance warning "that the ads could qualify as express advocacy under Wisconsin's campaign finance laws." *Id.* at 679, 681, 597 N.W.2d at 734, 736. The Board's actions, therefore, violated the organization's rights to due process of law. *Id.*

¶ 23.   The Coalition maintains that *WMC* controls this appeal. We disagree. First, as we have said, there is no question of "express advocacy" in this case. The issue is the Board's authority to investigate allegations of an illegal contribution to the Wilcox campaign. Second, in *WMC* the Board had (a) completed an investigation of a complaint, (b) specifically determined that a violation of reporting laws existed because, based on the context in which the advertisements were run, they constituted express advocacy, (c) issued an order to

___

[9] The Board did not point to any language in the advertisements—any "magic language" of the type referred to in the now-famous footnote 52 in *Buckley*, 424 U.S. at 44, n. 52—advocating the legislators' defeat, but instead considered factors such as "the proximity in time of the communication to an election, the underlying intent of the communication, the effect of the communication, the audience, and the proximity of the geographical area in which the communication is disseminated to the voting district of the featured candidate." *Elections Board v. WMC*, 227 Wis. 2d 650, 671–72, 597 N.W.2d 731, 732 (1999).

685

that effect and, when WMC refused to comply, (d) went to court to seek forfeitures for the violations. In this case, the Board has yet to arrive at point (a). Plaintiffs are attempting to halt the Board's investigation before it has even begun. We do not see *WMC* as having any application to the issues before us.[10]

[10] Even so, we have difficulty accepting plaintiffs' argument that a standard based on a committee's "cooperation or consultation" with another entity, and whether it acted "in concert with or at the request or suggestion of" that entity, WIS. ADM. CODE § ElBd 1.42(2), is so elusive or so impossible of a definition as to violate the principles of fairness and notice that underlie the due process clause. Under *Buckley*'s interpretation of the related federal election laws, expenditures by an independent group that are "coordinated" with an election committee are subject to regulation, *id.*, 424 U.S. at 47, and at least one federal court has had little trouble defining and applying that term. In *Federal Election Commission v. The Christian Coalition*, 52 F. Supp.2d 45 (1999), the court said that

> where the candidate or her agents can exercise control over, or where there has been substantial discussion or negotiation between the campaign and the spender over, a communication's: (1) contents; (2) timing; (3) location, mode or intended audience . . .; or (4) volume (e.g., number of copies of printed materials or frequency of media spots). Substantial discussion or negotiation is such that the candidate and spender emerge as partners or joint venturers in the expressive expenditure, but the candidate and spender need not be equal partners. This standard limits [the federal law]'s contribution prohibition on expressive coordinated expenditures to those in which the candidate has taken a sufficient interest to demonstrate that the expenditure is perceived as valuable for meeting the campaign's needs or wants.

*Id.* at 92.

The district court's discussion is as much common sense as it is legal analysis. And the Coalition has not persuaded us that it would be constitutionally impermissible (on the basis of inadequate or unfair notice) for the Board to commence an investigation into whether—in the words of Wisconsin statutes

¶ 24.   We therefore affirm the circuit court's order dismissing the plaintiffs' action. The stay of enforcement of the order which we granted on November 11, 1999, will expire at 4:30 p.m. three business days from today, on December 1, 1999.

*By the Court.*—Order affirmed.

and administrative rules—the postcard mailing was undertaken in "cooperation or consultation," or "in concert with or at the request or suggestion of" agents of the Wilcox campaign.